# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

RETAIL ENERGY ADVANCEMENT LEAGUE,
  213 Market Street, Eighth Floor,
  Harrisburg, PA 17101; and

GREEN MOUNTAIN ENERGY COMPANY,
  910 Louisiana Street,
  Houston, TX 77002;
                          Plaintiffs,


    v.                                               Civil Action No. 1:24-cv-2820

ANTHONY G. BROWN, in his official capacity as
Attorney General of Maryland,
  200 St. Paul Place
  Baltimore, MD 21202;

FREDERICK H. HOOVER, in his official capacity as
Chair of the Maryland Public Service Commission,
  William Donald Schaefer Tower,
  6 St. Paul Street, 16th Floor,
  Baltimore, MD 21202;

MICHAEL T. RICHARD, in his official capacity as
member of the Maryland Public Service Commission,
  William Donald Schaefer Tower,
  6 St. Paul Street, 16th Floor,
  Baltimore, MD 21202;

KUMAR P. BARVE, in his official capacity as mem-
ber of the Maryland Public Service Commission,
  William Donald Schaefer Tower,
  6 St. Paul Street, 16th Floor,
  Baltimore, MD 21202; and

BONNIE A. SUCHMAN, in her official capacity as
member of the Maryland Public Service Commission,
  William Donald Schaefer Tower,
  6 St. Paul Street, 16th Floor,
  Baltimore, MD 21202;
                          Defendants.

## COMPLAINT

Plaintiffs Retail Energy Advancement League ("REAL") and Green Mountain Energy Company ("Green Mountain," and, with REAL, collectively, "Plaintiffs"), by and through counsel, bring this suit against Defendants Anthony G. Brown, Frederick H. Hoover, Michael T. Richard, Kumar P. Barve, and Bonnie A. Suchman, in their official capacities (collectively, "Defendants").  In support thereof, Plaintiffs state as follows:

## INTRODUCTION

1.      For decades, retail energy providers have been able to lawfully market clean energy solutions to residential consumers in Maryland, explaining how their products are better for the environment than the service offered by the local incumbent utility, with benefits like combatting climate change.  But starting on January 1, 2025, a new Maryland law will prohibit these providers from truthfully and accurately describing these products, on pain of civil penalties, unless these providers agree with *the government's* views on green energy.  If that law were to take effect, providers would either need to abandon green marketing altogether, while charging the same rate-capped price for service previously reserved for the utility, or else change their service offerings to conform to the government's views of renewable energy.  And even if providers were willing to adopt Maryland's speech restrictions, they still could not describe and sell their green energy products before seeking government approval to charge a cost-based premium for those products.  As a result, many retail providers will choose to stop marketing and selling products in Maryland altogether, at dramatic cost to consumer choice, the environment, and the marketplace of ideas.

2.      The law at issue, introduced in the Maryland General Assembly as Senate Bill 1 and signed into law on May 9, 2024 (the "Act"), purports to be "[a]n Act concerning . . . regulation and consumer protection" in the retail energy supply sector.  *See generally* 2024 Maryland Laws ch. 537 (S.B. 1).  But in reality, the Act imposes an environmental speech code on suppliers of

renewable residential electricity who—accurately, truthfully, and consistently with federal standards and other states' laws—describe their products as "renewable," "green," "clean," "eco-friendly," and the like (collectively, "green power").

3.      The Act does so by prohibiting suppliers of renewable residential electricity from truthfully and accurately describing their existing products as "green power," on pain of civil penalties.  *See* Md. Code, Pub. Util. §§ 7-507(k), 7-707(a)–(c).  And if suppliers wish to continue to engage in "green power" marketing, they must adopt Maryland's preferred understanding of those terms, change the products they offer accordingly, and obtain advance approval from the Maryland Public Service Commission ("PSC") pursuant to a process that does not exist.

4.      REAL members like CleanChoice Energy, Inc. ("CleanChoice"), supply renewable residential electricity to customers in Maryland and elsewhere.  So too do subsidiaries of REAL members, like Green Mountain, a subsidiary of REAL member NRG Energy, Inc.  These entities do so by purchasing renewable energy certificates (also called renewable energy credits)—"RECs," for short—from all over the country and pairing those RECs with the electricity they supply to their customers.  RECs are fungible commodities that embody the renewable attributes of renewable energy generation and are recognized federally and by states as the way to substantiate "green power" claims.

5.      Consistent with the "Green Guides" promulgated by the Federal Trade Commission, as well as the laws of other states in which they sell renewable energy, REAL members and their subsidiaries describe their current renewable energy products—electricity paired with RECs—as "green power" accurately, truthfully, and lawfully.  They also make disclosures about their products to the extent necessary to comply with federal standards.

6.     Maryland's conception of "green power," however, would require REAL members and their subsidiaries to change their current renewable products sold to Maryland customers in order to be able to continue describing those products as "green power."  Specifically, under Maryland's conception of "green power," REAL members and their subsidiaries cannot describe their renewable products as "green power" unless they obtain 51% of the RECs paired with their electricity supply to Maryland customers from renewable energy generation sources in and around Maryland.

7.     Further, to describe their products as "green power," suppliers of renewable residential electricity are forced by the Act to make controversial and inaccurate disclosures about the nature of their product offerings, including the claim that a REC can be sold separately from the "renewable" electricity on which it is based, a claim the Green Guides deem misleading.

8.     Absent relief from the Act's requirements, REAL members and their subsidiaries either will have to cancel their existing contracts with residential customers (and thus lose customers permanently to the default local utilities) or sell their more expensive products at a substantially lower price and without the ability to describe their product as "green power"—the reason they attract and retain customers in the first place.  Either way, then, the speech of REAL members and their subsidiaries will be silenced, and they will lose customers and market share to the default local utilities.

9.     By foisting a speech code on REAL members and their subsidiaries, the Act violates the First Amendment of the U.S. Constitution and Article 40 of the Maryland Declaration of Rights.  Maryland's speech code fails any relevant level of constitutional scrutiny, as any purported interests served by the Act's "green power" provisions are not sufficiently compelling or serious

to justify the speech burdens imposed and those provisions are not sufficiently tailored to serve any purported government interest.

10.    Further, by prohibiting REAL members and their subsidiaries from acquiring certain of their RECs from sources around the country rather than sources in and around Maryland, the Act violates the Commerce Clause of the U.S. Constitution.  This prohibition discriminates against interstate commerce by restricting renewable residential electricity suppliers from purchasing RECs they otherwise would from renewable generation sources outside the Maryland region (thereby disfavoring those renewable energy sources) and forcing those suppliers to purchase more RECs from renewable generation sources in the Maryland region (thereby favoring those renewable energy sources).  And this prohibition unduly burdens interstate commerce as well—from a renewability standpoint, local and national RECs are fungible and provide the same benefits towards ameliorating climate change and related issues.  The burdens imposed by the Act on renewable generation sources outside the Maryland region outweigh any putative local benefit from this prohibition.

11.    Plaintiffs seek declaratory and injunctive relief against the Act as a whole to prevent the imminent, irreparable injuries it is about to impose on suppliers of renewable residential electricity in Maryland.  The Act's "green power" provisions are central to the Act's overall scheme, which sought to create one regulatory scheme for the renewable electricity market and another regulatory scheme for the standard electricity market.  Without the "green power" provisions, suppliers in the renewable electricity market will be subject to the regulatory scheme the General Assembly intended to apply to suppliers in the standard electricity market, contrary to the legislature's intent.  In these circumstances, the Act is inseverable and must be enjoined entirely.

## PARTIES

12.     Plaintiff REAL is a national advocacy organization dedicated to the expansion and modernization of American retail energy markets and is at the forefront of helping consumers obtain cost-efficient, renewable energy options.  REAL represents its members' interests by monitoring legal developments within the energy industry in the United States, advocating before federal and state legislatures and agencies about energy issues, and supporting or defending its' members interests in litigation related to energy regulation in the United States.[1]  REAL is a Pennsylvania corporation with its principal place of business at its headquarters in Harrisburg, PA.

13.     REAL's members include renewable residential electricity suppliers like Clean-Choice.  CleanChoice is one of the nation's largest independent electricity supply retailers that exclusively offers its customers 100% renewable energy products; it is among the top five residential electricity suppliers in Maryland, by number of customers; it accurately, truthfully, and lawfully describes its product to Maryland customers as "green power"; and it will no longer be able to do so under the Act.

14.     Plaintiff Green Mountain is the nation's longest-serving renewable energy retailer and a mission-driven company focused on sustainability whose goal is to inspire hope and motivate action through the use of clean energy.  Green Mountain is a carbon-neutral company that supplies 100% clean energy to its customers, including renewable residential electricity to customers in Maryland.  Green Mountain accurately, truthfully, and lawfully describes its product to Maryland customers as "green power"; and it will no longer be able to do so under the Act.  Green Mountain

---

[1] Constellation Energy Generation, LLC and Constellation NewEnergy, Inc., (collectively Constellation), a REAL member headquartered in Baltimore, publicly opposed passage of the Act but did not authorize or participate in this lawsuit.

is a wholly owned subsidiary of NRG Energy, Inc., a member of REAL.  Green Mountain is a Delaware corporation with its principal place of business at its headquarters in Houston, TX.

15.     Defendant Anthony G. Brown is the Attorney General of Maryland.  He is sued in his official capacity.  The Maryland Attorney General has a role in enforcing the Act.  *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1).  The Maryland Attorney General's headquarters are located at 200 St. Paul Place, Baltimore, MD 21202.

16.     Defendant Frederick H. Hoover is the Chair of the PSC.  He is sued in his official capacity.  The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act.  *See, e.g.*, *id.*; *id.* § 7-707(c)–(d).  The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

17.     Defendant Michael T. Richard is a Commissioner of the PSC.  He is sued in his official capacity.  The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act.  *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1); *id.* § 7-707(c)–(d).  The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

18.     Defendant Kumar P. Barve is a Commissioner of the PSC.  He is sued in his official capacity.  The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act.  *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1); *id.* § 7-707(c)–(d).  The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

19.     Defendant Bonnie A. Suchman is a Commissioner of the PSC.  She is sued in her official capacity.  The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act.  *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1); *id.* § 7-707(c)–

(d).  The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

## JURISDICTION & VENUE

20.     This case arises under the First Amendment and Fourteenth Amendment of the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and 42 U.S.C. § 1983, as well as Article 40 of the Maryland Constitution, Declaration of Rights.  This Court has federal-question jurisdiction over the claims arising under the U.S. Constitution and federal law, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over the claims arising under the Maryland Constitution, *see id.* § 1367(a).

21.     Venue is proper in this District because it is the judicial district in which all Defendants reside.  *See id.* § 1391(b)(1); *Honchok v. Hardin*, 326 F. Supp. 988, 990–91 (D. Md. 1971) (collecting authorities explaining that, for venue purposes, residency of a government official sued in their official capacity is the location of their office).

22.     Venue is proper in this Division because all Defendants are located in this Division, all Defendants are residents of Maryland, and at least one Defendant resides in this Division.  *See* 28 U.S.C. § 100(1) ("The Northern Division comprises . . . the City of Baltimore."); *Honchok*, 326 F. Supp. at 990–91.

## STATEMENT OF FACTS

### *Plaintiffs and the National Renewable Energy Market*

23.     REAL members and their subsidiaries sell renewable electricity supply to residential customers in Maryland.

24.     REAL members and their subsidiaries describe their renewable products as "green," "clean" (and "100% clean"), "renewable" (and "100% renewable") "pollution free" (and

"100% pollution free"), "100% renewable wind," "100% renewable wind and solar," "eco-friendly," "sustainable," and similar terms.

25.     REAL members and their subsidiaries do so because energy customers increasingly care about their impact on the environment.  More and more, energy customers are looking for supply options that will allow them to reduce carbon emissions and thereby combat climate change.

26.     REAL members and their subsidiaries provide renewable electricity supply to residential customers in Maryland by pairing their grid-sourced electricity supply with RECs obtained from renewable energy generation sources nationwide.

27.     The process of supplying the electricity relied on across the nation can generally be divided into three stages: generation, transmission, and distribution.  Electricity is generated from non-renewable sources like coal power plants or renewable sources like wind farms.  It is then transmitted into and through the electric grid in the United States.  And ultimately, it is distributed to end users—businesses, residences, and the like.

28.     Because electricity is transmitted on a shared grid, there is no practical way to tell which electrons in the grid were generated from renewable sources as opposed to non-renewable sources.  *See, e.g.*, Nat'l Renewable Energy Lab'y, *Renewable Electricity: How Do You Know You Are Using It?* 1 (2015), https://www.nrel.gov/docs/fy15osti/64558.pdf ("When electricity is generated—either from a renewable or non-renewable power plant—the electrons added to the grid are indistinguishable.").

29.     Enter RECs, which are commodities that "play an important role in accounting, tracking, and assigning ownership to renewable electricity generation and use."  EPA, *Renewable*

*Energy Certificates (RECs)*, https://www.epa.gov/green-power-markets/renewable-energy-certif-

icates-recs ("EPA, *RECs*") (last visited Sept. 26, 2024).

30.     A REC is a "market-based instrument" that embodies one megawatt-hour of elec-

tricity that is generated and delivered to the electricity grid from a renewable energy generation

source such as a windmill or a solar panel.  *See id.*  In other words, a REC embodies the renewable

attributes of electricity generated by renewable sources.

31.     As Green Mountain explains on its website, renewable energy is like Velcro, con-

sisting of two parts: the electrons that make up the electricity itself, and the renewable attributes

of the electricity embodied in a REC.  *See* Green Mountain, *Part 1: What the Heck Is a REC?*,

https://www.greenmountainenergy.com/en/blog/business-news/part-1-what-the-heck-is-a-rec

("*What the Heck Is a REC?*").  Like the two sides of Velcro, the two parts of renewable energy

can be separated, and the renewable attributes can be paired with different electrons.  *See id.*  When

that happens, the renewable attributes paired with the different electrons becomes renewable en-

ergy.  *See id.*  And because the original electrons no longer have the renewable attributes that were

transferred via the REC, the original electrons by themselves are not renewable energy.  *See* Green

Guides, 16 C.F.R. § 260.15(a), (c)–(d), Example 5.

32.     For this reason, the EPA has recognized that "RECs are the instrument that elec-

tricity consumers must use to substantiate renewable electricity use claims."  EPA, *RECs*, *supra*.

Or, as the White House Council on Environmental Quality put it, "RECs are essential to claims

concerning renewable energy." The White House Council on Env't Quality, *Federal Greenhouse

Gas Accounting & Reporting Guidance* 27 (Rev. 1, June 2012), https://www.sustainabil-

ity.gov/pdfs/federal_ghg%20accounting_reporting-guidance.pdf.     And as the FTC's "Green

Guides"—which set federal standards for making "green" claims—recognize, matching "non-

renewable energy use with renewable energy certificates" is an appropriate means for substantiating renewable energy claims. *See* Green Guides, 16 C.F.R. § 260.15(a).

33.     Renewable generation sources from across the country produce RECs.  For instance, wind farms in Texas, solar farms in California, and hydroelectric plants in Oklahoma all generate RECs.  These RECs are then sold to a variety of market participants, including electricity suppliers looking to make their grid-sourced electricity "green."

34.     Thus, the national REC market is vital to the advancement of renewable energy.

35.     The price of RECs varies widely among renewable generation sources.  Factors that cause this price variation include details like type of renewable energy generated (e.g., wind versus solar), geographical location of the generation source (e.g., off-shore wind versus land-based wind), and the state in which the generation source is located (given different regulatory schemes imposing different costs that get reflected in the price of RECs).

36.     However, because RECs all embody the renewable attributes of one megawatt-hour of generated renewable energy, RECs are "a fungible commodity."  EPA Clean Energy—Env't Tech. Forum, *Renewable Energy Certificates: Background & Resources* 1 (2008), https://www.epa.gov/sites/default/files/2016-03/documents/background_paper_3.pdf.

37.     Because renewable electricity supply generally consists of grid electricity paired with RECs, renewable electricity generally is more expensive for retail customers than non-renewable electricity.

### *2024 Maryland Senate Bill 1*

38.     Since 1999, when Maryland enacted the Electric Customer Choice and Competition Act to give residential electricity customers the option of obtaining their electricity supply from someone other than their default local utility, *see* Md. Dep't of Legis. Servs., Off. of Policy Analysis, *The Road to Electric Restructuring in Maryland* 5–6 (2006),

11

https://dls.maryland.gov/pubs/prod/BusTech/Road_to_Electric_Restructuring_2006.pdf, the residential electricity supply market in Maryland has flourished.  REAL members and their subsidiaries have been supplying residential electricity to retail customers in Maryland for more than a decade.

39.     For renewable electricity they sell to Maryland customers—that is, grid-sourced electricity paired with RECs—REAL members and their subsidiaries describe their products accurately and truthfully as "green power."  Further, under existing regulations, they must disclose to their customers that RECs may be used to meet certain obligations under State law.  *See* Md. Code Regs. § 20.61.04.01(B)(2).  And in practice, REAL members and their subsidiaries disclose to their customers that they use RECs to provide renewable electricity.

40.     The Act, however, prevents REAL members and their subsidiaries from continuing to describe their products accurately and truthfully as "green power" unless they comply with an onerous speech code that burdens their speech and commerce rights.

41.     The Act was signed into law on May 9, 2024, *see generally* 2024 Maryland Laws ch. 537 (S.B. 1), and it applies to all electricity supply contracts entered into on or after January 1, 2025, *id.* § 9.

42.     As the Act's Senate sponsor explained, pursuant to an amendment to the original bill, the Act generally "create[s] two different markets" for residential electricity supply in Maryland.  *See Hearing Before the House Econ. Matters Comm.*, at 08:00–08:25 (Mar. 26, 2024) ("*March House Hearing*"),  https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=ecm&clip=ECM_3_26_2024_meeting_1&ys=2024rs (Testimony of Sen. Augustine).

43.     One market created by the Act ("standard market") is for ordinary residential elec-
tricity supply; that is, electricity supply "other than green power."  *See* Md. Code, Pub. Util. § 7-
510(d)(2)(i), (iv); *id.* § 7-707(c).  In that market, rates that electricity suppliers may charge are
capped at a price that may not exceed the default local utility's average price over the prior twelve
months for its default service.

44.     The other market created by the Act is a "green power products market" for resi-
dential electricity supply sold as "green power."  *See March House Hearing*, *supra*, at 08:00–
08:25.  In this "green power" market, renewable residential electricity suppliers "may exceed th[e]
price cap" in the standard market.  *See id.*; Md. Code, Pub. Util. § 7-510(d)(2)(i); *id.* § 7-
707(d)(2)(ii)(1).

45.     But to be able to participate in the "green power" market, renewable residential
electricity suppliers must comply with restrictions on speech for what qualifies as "green power,"
which the Act defines broadly to mean electricity described as "clean, green, eco-friendly, envi-
ronmentally friendly or responsible, carbon-free, renewable, 100% renewable, 100% wind, 100%
hydro, 100% solar, 100% emission-free, or similar claims."  Md. Code, Pub. Util. § 7-707(a).  And
they must comply with several compelled-speech obligations.

<u>*The Act's Speech Restrictions*</u>

46.     Effective January 1, 2025, the Act prohibits renewable residential electricity sup-
pliers from describing their electricity as "green power" unless they meet three criteria.

47.     First, at least 51% of the RECs paired with the electricity being described as "green
power" must be RECs that satisfy Maryland's renewable energy portfolio standard ("RPS").  *See
id.* § 7-707(c)(1); *id.* § 7-703(b).

48.     To satisfy Maryland's RPS, RECs must come from certain renewable generation sources in a defined region in or around Maryland.  Specifically, RECs must come from certain renewable generation sources "located: (1) in the [Pennsylvania-New Jersey-Maryland ("PJM")] region; (2) outside the [PJM region] but in a control area that is adjacent to the PJM region, if the electricity is delivered into the PJM region; or (3) on the outer continental shelf of the Atlantic Ocean" in certain designated areas "between 10 and 80 miles off the coast" of Maryland.  *See id.* § 7-701(m).  The "PJM region" refers to all or parts of thirteen states[2] and the District of Columbia contained within the "PJM Interconnection," a federally regulated entity that manages the electric grid in that region of the country.  *See* PJM, *Territory Served*, https://www.pjm.com/-/media/about-pjm/pjm-zones.ashx (last visited Sept. 26, 2024).

49.     In other words, under the Act, residential suppliers of renewable electricity—including REAL members and their subsidiaries—are not allowed to truthfully and accurately call their electricity "green power," even if paired 100% with RECs, unless 51% of those RECs are obtained from generation sources in or around Maryland.

50.     Because renewable energy generation sources from around the country generate RECs that renewable electricity suppliers can purchase, this requirement discriminates against and burdens renewable energy generation sources outside of the Maryland region by prohibiting their RECs from qualifying towards the Act's 51% requirement.  And this requirement privileges renewable energy generation sources in the Maryland region by making only their RECs sufficient to satisfy the Act's 51% requirement.  That is, by design, this requirement discourages renewable residential electricity suppliers in Maryland from obtaining RECs from renewable generation sources outside the Maryland region and requires them to obtain RECs from renewable generation

---

[2] Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

sources in or around Maryland, thereby discriminating against and burdening those out-of-region generation sources by reducing demand for their RECs compared to in-region generation sources. And this, in turn, harms REAL members and their subsidiaries by restricting their ability to purchase RECs they otherwise would in order to supply their residential customers with renewable electricity.

51.     Second, on an annual basis the PSC must "approve[] the price of the electricity being marketed as green power" in accordance with ratemaking proceedings that the Act requires the PSC to create and conduct.  *See id.* § 7-707(c)(2), (d)(1), (d)(2)(i), (d)(3)(i), (d)(5)(i); *id.* § 7-713.

52.     However, despite having filed on September 9, 2024, the draft regulations ostensibly meant to implement § 7-707 of the Act, the PSC has not proposed creating the ratemaking process called for under the law.

53.     And even when the process is created, renewable residential electricity suppliers will not be allowed to charge more than 150% of the default local utility's average price over the prior twelve months for its default service, except for if the supplier's cost exceeds that amount (in which case the supplier is capped to charging "only the actual price" of the renewable electricity). *See id.* § 7-707(d)(4)(i)–(ii).

54.     Further, if those ratemaking proceedings are ever created, the Act requires the PSC to take into account in them "[t]he state in which the electricity" that is being described as "green power" was generated.  *See id.* § 7-707(d)(2)(iii)(1)(C), (d)(3)(iii)(4).  This price factor underscores the Act's inherently discriminatory approach to out-of-region renewable energy—not only does it discourage renewable electricity suppliers from purchasing out-of-region RECs, but it also factors into the price they may charge the locale from which their electricity supply comes.

55.     Third, the electricity supplier must submit an application to the PSC that describes the "green power" electricity, including the "green power" source and the percentage of the electricity being supplied that actually is "green power"; describes how the "green power" complies with Maryland law; and "includes any other information the [PSC] considers necessary." *Id.* § 7-707(c)(3).

*The Act's Compelled-Speech Obligations*

56.     Further, even if renewable residential electricity suppliers can run this gauntlet just to surmount the Act's "green power" speech restrictions, they are then compelled by the Act to make controversial and inaccurate disclosures about the nature of their product offerings.

57.     For example, renewable residential electricity suppliers describing their products as "green power" must make the following disclosure to customers:

> We deliver energy through the purchase of Renewable Energy Credits (RECs).  A REC represents the ***social good*** that accompanies 1 megawatt-hour of renewable electricity generation.  ***RECs*** may be sold separately from ***renewable*** electricity itself.  Renewable electricity and RECs may be sold to different entities.  The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.

*Id.* § 7-707(f)(2) (emphases added).

58.     While RECs are part of the process by which renewable energy serves the social good, it is controversial whether RECs themselves "represent" a "social good."

59.     And while RECs may be sold separately from the underlying electricity that was generated in connection with the REC, when that occurs the underlying electricity is no longer "renewable," contrary to this mandatory disclosure.  *See* Green Guides, 16 C.F.R. § 260.15(d) & Example 5.

16

60.     The Act also requires renewable residential electricity suppliers to include in their "marketing materials" an explanation of how the "green power"—as Maryland has defined it—"will benefit the environment."  Md. Code, Pub. Util. § 7-707(g)(3).

61.     These compelled disclosures would require REAL members and their subsidiaries to alter their current speech about their products and speak in ways with which they disagree.

*       *       *

62.     Compounding the Act's problems, the Act gives the PSC unqualified "discretion" to "determine whether an electricity supplier" is satisfying the foregoing speech code.  *See* Md. Code, Pub. Util. § 7-707(h).

63.     Further, the Act exempts, either explicitly or implicitly, several different types of sellers of energy products from this speech code.

64.     For instance, in the Act, Maryland exempted itself from the "green power" speech code when its "Department of General Services sells energy" or RECs to purchasers.  *See id.* § 7-707(b)(1) (referencing *id.* § 7-704.4(c)(3)).  That is, by the Act's terms, one of the State's own agencies may market its electricity products as "green power" freely when selling it, without having to comply with the Act's speech restrictions or mandatory disclosures.

65.     Similarly, the Act explicitly exempts the Montgomery County community choice aggregator from its "green power" speech code.  *See id.* § 7-707(b)(2).  Under Maryland law, the purpose of this government entity is to aggregate and purchase electricity supply on behalf of residents and small businesses and then turn around and manage the electricity supply for those customers.  *See id.* § 7-510.3(b), (c)(2), (o), (q), (s)(1).  This entity may supply REC-backed electricity.  *See id.* § 7-510.3(f)(2)(vi), (j)(1)(ii), (k)(1).  It also may "promot[e] the use of renewable energy."  *Id.* § 7-510.3(j)(1)(ii).  And it is required—either by doing so itself or by causing its

"selected electricity supplier" to do so on its behalf—to inform its customers of the "total renewable component of the electricity to be supplied." *Id.* § 7-510.3(f)(2)(vi). But, whether speaking itself or through the "selected electricity supplier," this Montgomery County entity is exempt from the Act's speech code—that is, even if the REC mix paired with its electricity supply does not consist of the 51% "green power" requirement in the Act, this community choice aggregator is free to describe its supply as "green power."

66.     The Act also exempts electricity suppliers that sell products to commercial retail electric customers from its "green power" speech code. *See id.* § 7-707(b)(3). By one recent count, there are 245,859 businesses in Maryland, and 92.8% of them—or approximately 228,157 of these businesses—have less than twenty employees. *See Maryland Overview*, https://www.business.maryland.gov/data/overview (last visited Sept. 26, 2024). Under the Act, a renewable electricity supplier selling its product to someone seeking electricity as a "residential" customer is prohibited from describing its product as "green power" unless it complies with the Act's speech code. But under this "commercial" exemption, a renewable electricity supplier selling its product to that same person seeking electricity as a mom-and-pop business operator is free to describe its product as "green power" to that person without having to comply with the Act's speech restrictions or mandatory disclosures.

67.     Further, some entities sell REC-only products directly to residential customers. *See, e.g.*, TerraPass, *Renewable Energy Certificates (One-Time Purchase)*, https://terrapass.com/product/productres-recs/. Such entities do not qualify as "electricity supplier[s]," *see* Md. Code, Pub. Util. § 1-101(l)(1), and thus under § 7-707(c)—which applies to "electricity supplier[s]"—these entities remain free to describe their products as "green power" without having to comply with the Act's speech code.

### *The Act Irreparably Injures Green Mountain*

68.     Green Mountain is a carbon-neutral energy retailer that supplies 100% renewable electricity to customers in seven states: Illinois, Massachusetts, New Jersey, New York, Pennsylvania, Texas, and Maryland.

69.     Green Mountain has been supplying renewable electricity to residential customers in Maryland since 2013.  Green Mountain currently serves nearly 2,000 residential electricity customers in Maryland.

70.     To provide renewable electricity to its residential customers in Maryland, Green Mountain obtains grid electricity and pairs 100% of that electricity with RECs.  Green Mountain then sells that combined product to its residential customers.

71.     Green Mountain's marketing of its electricity supply emphasizes the renewable attributes of that product.  Green Mountain describes its product as "green," "clean[]," "100% clean," "renewable," "pollution free," "100% Pollution Free," and "100% renewable wind."  Green Mountain does so because its residential customers in Maryland purchase its electricity supply because of its renewable attributes; and they are willing to pay a premium over the rates of the default local utility that does not offer 100% REC-backed electricity.  Green Mountain is able to attract and retain residential customers in Maryland because it is able to describe its product as "green power." Green Mountain's description of its product is truthful and accurate and complies with the Green Guides as well as with the laws of the other states in which it sells its product.

72.     Green Mountain already informs customers about the nature of its product.  For instance, on a page of its website, Green Mountain explains that the RECs it pairs with the grid electricity it supplies its customers "represent the environmental and other non-power attributes of renewable electricity generation."  Green Mountain, *What Is Clean Energy?*, https://www.green-mountainenergy.com/en/why-renewable-energy/benefits-of-clean-electricity ("*What Is Clean*

*Energy?*").  Green Mountain also explains in each of its customer contracts that its product is electricity paired with RECs.  On its website, Green Mountain also explains that when RECs are sold separately from the underlying energy on which they are based, the underlying energy "is no longer considered renewable."  *See What the Heck Is a REC?*, *supra*.

73.     On its website, Green Mountain also explains the "[e]nvironmental benefits" of its 100% renewable product.  *See What Is Clean Energy?*, *supra*.  These include that its product "[h]elps preserve and protect the environment for future generations" and that it "[d]oesn't emit carbon dioxide (CO2), mercury, nitrogen oxides (NOx), sulfur dioxide (SO2) or particulate matter into the air, water or soil," key drivers of climate change and other environmental issues.  *Id.*; *see also Green Mountain Energy: Make a Positive Impact with Clean Energy*, https://www.youtube.com/watch?v=HJorVOuFu48 (explaining that its product helps customers "live a greener lifestyle," "leads to a cleaner grid," and "help[s] protect the environment").

74.     Green Mountain acquires its RECs from generation sources all over the country. For electricity supply to Maryland customers, Maryland requires electricity companies to purchase sufficient RPS-eligible RECs, or pay a fee, to comply with the RPS.  To get to 100% renewable electricity, an electricity company may obtain additional RECs above and beyond what the RPS requires to pair 100% of its electricity supply to Maryland customers with RECs.  For example, in 2024, under the RPS, a renewable energy company must provide 36.2% renewable electricity to its customers—that is, 36.2% of its electricity has to be paired with RPS-eligible RECs—or it must pay a fee.  To provide 100% renewable electricity to its Maryland customers in 2024, a renewable electricity company must obtain enough RECs to cover the remaining 63.8% of its supply.  To support its claim of 100% renewable electricity, Green Mountain acquires RECs from generation sources all over the country that do not qualify under Maryland's RPS.

75.     Green Mountain does not currently acquire 51% of the RECs it pairs with its renewable residential electricity supply to Maryland customers from sources that qualify under Maryland's RPS.  Green Mountain would have to incur significant costs to do so; and it would no longer be able to acquire many RECs it currently does from sources outside the Maryland region.

76.     Green Mountain does not need to source RECs differently than it currently does to be able to describe its product truthfully and accurately as "green power."  And Green Mountain does not wish to alter its speech in any way to explain what RECs represent, what their relationship is to the generation source on which they are based, or how "green power" as Maryland has defined it (and which is different than Green Mountain's description) is environmentally beneficial.

### The Act Irreparably Injures CleanChoice

77.     CleanChoice is a mission-driven, clean-tech company that empowers people and businesses to easily access solutions for climate change.  Fundamentally, CleanChoice's mission is to make it easy for everyone, everywhere to choose clean electricity.

78.     CleanChoice is a 100% renewable electricity supplier to approximately 235,000 retail customers in the District of Columbia and eight states: Delaware, Illinois, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Maryland.

79.     CleanChoice has been supplying renewable electricity to residential customers in Maryland since 2012.  CleanChoice currently has about 20,000 residential electricity customers in Maryland.

80.     To provide renewable electricity to its residential customers in Maryland, CleanChoice obtains grid electricity and pairs 100% of that electricity with RECs.  CleanChoice then sells that combined product to its residential customers.

81.     CleanChoice's marketing of its electricity supply emphasizes the renewable attributes of that product.  CleanChoice describes its product as "green," "clean," "100% clean,"

"pollution-free," "100% pollution free," "100% renewable," "sustainable," and "eco-friendly." CleanChoice does so because its residential customers in Maryland purchase its electricity supply because of its renewable attributes; and they are willing to pay a premium over the rates of the default local utility that does not include 100% REC-backed electricity. CleanChoice is able to attract and retain residential customers in Maryland because it is able to describe its product as "green power." CleanChoice's description of its product is truthful and accurate and complies with the Green Guides as well as with the laws of the other states in which it sells its product.

82. CleanChoice already informs customers about the nature of its product. For instance, on a page of its website, CleanChoice explains that the RECs it pairs with the grid electricity it supplies its customers "represent the environmental attributes of the power produced from renewable energy projects." *See* CleanChoice, *How We Bring You Clean Energy*, https://cleanchoiceenergy.com/news/how-we-bring-you-clean-energy. And in a report accessible on CleanChoice's website, it is explained that, when a REC is sold separately from the energy on which it is based, the "renewable attribute" of that energy travels with the REC and does not "remain attached to the generated electricity." *See* Center for Resource Solutions, *The Legal Basis for Renewable Energy Certificates* 10 (2023), *available at* CleanChoice, *What Are Renewable Energy Certificates? How You Can Choose Clean Energy Through RECs*, https://cleanchoiceenergy.com/news/clean-renewable-energy-certificates-recs.

83. On its website, CleanChoice also explains the environmental benefits from using its product. *See* CleanChoice, *Clean Electricity for a Cleaner World*, https://cleanchoiceenergy.com/products/clean-electricity. These include that its product "help[s] the environment" by "greatly reducing [one's] carbon footprint" and "increas[ing] demand for clean energy, paving the way to become less reliant on polluting fossil fuels." *See id.*

84. CleanChoice acquires its RECs from generation sources all over the country, largely in the Upper Midwest and Mid-Atlantic Regions. To provide 100% renewable electricity to its Maryland customers in 2024, CleanChoice acquires RECs from generation sources all over the country that do not qualify under Maryland's RPS.

85. CleanChoice does not currently acquire 51% of the RECs it pairs with its renewable residential electricity supply to Maryland customers from generation sources that qualify under Maryland's RPS. CleanChoice would have to incur significant costs to do so; and it would no longer be able to acquire many RECS it currently does from sources outside the Maryland region.

86. CleanChoice does not need to source RECs differently than it currently does to be able to describe its product truthfully and accurately as "green power." And CleanChoice does not wish to alter its speech in any way to explain what RECs represent, what their relationship is to the generation source on which they are based, or how "green power" as Maryland has defined it (and which is different than CleanChoice's description) is environmentally beneficial.

### The Act's Unconstitutional Effects

87. The Act violates the speech and commerce rights of renewable residential electricity suppliers such as REAL members and their subsidiaries and threatens them with irreparable economic injuries.

88. First, although REAL members and their subsidiaries truthfully, accurately, and lawfully describe their products as "green power" under the Green Guides and the laws of the other states in which they sell renewable electricity, they can no longer do so in Maryland under the Act because of Maryland's views on the meaning of "green power." Further, if they want to describe the products they sell in Maryland as "green power," to conform with Maryland's views on what that means, the Act requires them to change the mix of RECs that they pair with their electricity supply and to go through a non-existent ratemaking process.

89.     Second, even if REAL members and their subsidiaries changed their views on the meaning of "green power" to conform to Maryland's, the Act compels them to speak in ways that would require them to alter their current speech—to describe RECs as representing a "social good," to describe the environmental benefits of the State's definition of "green power," and to explain misleadingly the relationship between RECs and the electricity from which they derive.

90.     Third, the Act prohibits renewable residential electricity suppliers such as REAL members and their subsidiaries from obtaining a certain percentage of their RECs from their preferred generation sources outside the Maryland region, instead requiring them to obtain that percentage of RECs from generation sources in the Maryland region.  That is, the Act explicitly disfavors renewable energy generation sources outside the Maryland region that create RECs and favors renewable energy generation sources in the Maryland region that create RECs.

91.     These burdens will force renewable residential electricity suppliers such as REAL members and their subsidiaries to forego participating in the "green power" market created by the Act and instead try to operate in the standard market.  But their products come with "additional costs," *see March House Hearing*, *supra*, at 16:40–16:50 (Testimony of Sen. Augustine) (acknowledging this), which is why the Act created the "green power" market to allow renewable residential electricity suppliers to charge more for their products.  Subject to the price caps in the standard market, renewable residential electricity suppliers such as REAL members and their subsidiaries will be forced to sell their products at a price that is not commercially viable.  Further, without the ability to describe their products as "green power" in the standard market, renewable residential electricity suppliers such as REAL members and their subsidiaries will be unable to attract and retain customers.  For these reasons, Green Mountain will soon face the prospect of a substantially lower revenue stream from the Maryland residential electricity supply market, and

CleanChoice is preparing to discontinue service for many of its existing customers and cease marketing to new customers in Maryland.

92.     Because both the U.S. Constitution and the Maryland Constitution prohibit Maryland from forcing renewable residential electricity suppliers such as REAL members and their subsidiaries into the horns of this dilemma, Plaintiffs hereby seek declaratory and injunctive relief to prevent the implementation and enforcement of the Act.

## COUNT I
### *U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201 (Speech Restrictions)*

93.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

94.     Under the First Amendment of the U.S. Constitution, "law[s] . . . abridging the freedom of speech" are prohibited.  U.S. Const. amend. I.  And the Fourteenth Amendment makes this prohibition applicable to the states.  *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

95.     Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . of any State . . . , subjects, or caused to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in a[] . . . suit in equity[] or other proper proceeding for redress."  Under § 1983, an injured party may obtain prospective relief against a "state official in his or her official capacity" to restrain the violation of constitutional rights.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).

96.     Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

97.     The Act violates the First Amendment right of freedom of speech of REAL members and their subsidiaries by prohibiting them from describing their products—accurately, truthfully, and consistently with the Green Guides and other states' laws—as "green power" unless they comply with the Act's speech code.

98.     The Act's speech code is a content-based restriction on speech because it restricts the speech of REAL members and their subsidiaries based on the idea or message expressed by that speech—namely, that their current renewable electricity supply is "green power" even though that supply does not conform to Maryland's definition of "green power."

99.     The Act's speech code is a viewpoint-based restriction on speech because it restricts the speech of REAL members and their subsidiaries based on their perspective that their current renewable electricity supply is "green power" even though it does not agree with Maryland's definition of the term, while permitting "green power" speech from those who agree with Maryland's views on what qualifies as "green power."

100.    Maryland has no compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does.  Because RECs are fungible from a renewability standpoint, there is nothing deceptive or otherwise improper about describing electricity paired 100% with RECs as "green power," even if the RECs come primarily from generation sources that are not RPS-eligible in Maryland.  Indeed, REAL members and their subsidiaries describe their products accurately, truthfully, and consistently with the Green Guides and other states' laws.  Further, Maryland customers are already aware that RECs are used to supply their renewable electricity.  *See* Md. Code Regs. § 20.61.04.01(B)(2).  And REAL members and their subsidiaries disclose this information to their Maryland customers already.

101.    Even if Maryland had a compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does, the Act's restrictions are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it bans renewable residential electricity suppliers from using a long list of particular "green power" terms without regard for whether all such suppliers' use of those terms was causing consumer confusion.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose "green power" product marketing could just as well cause consumer confusion.  And Maryland has alternative means of serving whatever interest it ostensibly has in the speech restrictions, such as enforcing existing laws against misleading advertising or engaging in public education campaigns about "green power."

102.    Accordingly, the Act is unconstitutional under the First Amendment, and Plaintiffs request that this Court enter a declaration that the Act violates the First Amendment as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## COUNT II
### *Md. Const., Decl. Rts., Art. 40, 28 U.S.C. § 2201 (Speech Restrictions)*

103.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

104.    Article 40 of the Maryland Constitution, Declaration of Rights protects the right "to speak, write and publish [one's] sentiments on all subjects."  Md. Const., Decl. Rts., art. 40.  Article 40 is "co-extensive" with the First Amendment.  *See Jakanna Woodworks, Inc. v. Montgomery Cnty.*, 689 A.2d 65, 70 (Md. 1997).

105.    Under Maryland law, "an officer of the State acting under color of his official authority may be enjoined from enforcing a State law claimed to be repugnant to the State or Federal Constitution."  *Davis v. State*, 37 A.2d 880, 885 (Md. 1944).

27

106.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal rela-

tions of any interested party seeking such declaration" in a case before it.

107.    The Act violates the Article 40 right of freedom of speech of REAL members and

their subsidiaries by prohibiting them from describing their products—accurately, truthfully, and

consistently with the Green Guides and other states' laws—as "green power" unless they comply

with the Act's speech code.

108.    The Act's speech code is a content-based restriction on speech because it restricts

the speech of REAL members and their subsidiaries based on the idea or message expressed by

that speech— namely, that their current renewable electricity supply is "green power" even though

that supply does not conform to Maryland's definition of "green power."

109.    The Act's speech code is a viewpoint-based restriction on speech because it restricts

the speech of REAL members and their subsidiaries based on their perspective that their current

renewable electricity supply is "green power" even though it does not agree with Maryland's def-

inition of the term, while permitting "green power" speech from those who agree with Maryland's

views on what qualifies as "green power."

110.    Maryland has no compelling or substantial state interest in restricting the speech of

REAL members and their subsidiaries in the manner the Act does.  Because RECs are fungible

from a renewability standpoint, there is nothing deceptive or otherwise improper about describing

electricity paired 100% with RECs as "green power," even if the RECs come primarily from gen-

eration sources that are not RPS-eligible in Maryland.  Indeed, REAL members and their subsidi-

aries describe their products accurately, truthfully, and consistently with the Green Guides and

other states' laws.  Further, Maryland customers are already aware that RECs are used to supply

their renewable electricity.  *See* Md. Code Regs. §§ 20.61.04.01(B).  And REAL members and their subsidiaries disclose this information to their Maryland customers already.

111.    Even if Maryland had a compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does, the Act's restrictions are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it bans renewable residential electricity suppliers from using a long list of particular "green power" terms without regard for whether all such suppliers' use of those terms was causing consumer confusion.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose "green power" product marketing could just as well cause consumer confusion.  And Maryland has alternative means of serving whatever interest it ostensibly has in the speech restrictions, such as enforcing existing laws against misleading advertising or engaging in public education campaigns about "green power."

112.    Accordingly, the Act is unconstitutional under Article 40, and Plaintiffs request that this Court enter a declaration that the Act violates Article 40 as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

**COUNT III**
***U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201 (Compelled Speech)***

113.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

114.    Under the First Amendment of the U.S. Constitution, "law[s] . . . abridging the freedom of speech" are prohibited.  U.S. Const. amend. I.  And the Fourteenth Amendment makes this prohibition applicable to the states.  *See Gitlow*, 268 U.S. at 666.

115.    Under 42 U.S.C. 1983, "[e]very person who, under color of any statute . . . of any State . . . , subjects, or caused to be subjected, any citizen of the United States or other person

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in a[] . . . suit in equity[] or other proper proceeding for redress."   Under § 1983, an injured party may obtain prospective relief against a "state official in his or her official capacity" to restrain the violation of constitutional rights.  *See Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. at 159–60).

116.   Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

117.   The Act violates the First Amendment right of freedom of speech of REAL members and their subsidiaries by compelling them to speak in ways that would alter their current speech and that they do not wish to alter their current speech—requiring them to describe RECs as representing a "social good," to describe the environmental benefits of the State's definition of "green power," and to explain misleadingly the relationship between RECs and the electricity underlying them.

118.   Because the Act's compelled-speech mandate requires REAL members and their subsidiaries to alter their current speech to utter a particular message, it is a content-based speech mandate.

119.   Maryland has no compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does.  REAL members and their subsidiaries already explain the nature of their product in their own accurate and truthful terms, they accurately and truthfully explain the environmental benefits of their existing product, and they explain the nature of their product accurately and truthfully.

120.   Even if Maryland had a compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does, the Act's mandates

are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it compels speech from all renewable residential electricity suppliers without regard for whether all such suppliers' current disclosures are inadequate.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose products could cause consumer confusion without mandatory disclosures.  And Maryland has alternative means of serving whatever interest it ostensibly has in the compelled-speech requirement, such as disclosure requirements that allow renewable residential electricity suppliers to explain in their own terms the nature of their product so long as the explanation is accurate and truthful, to accurately and truthfully explain the environmental benefits of their existing product rather than the State's definition of "green power," and to explain the nature of their product accurately and truthfully.

121.    Accordingly, the Act is unconstitutional under the First Amendment, and Plaintiffs request that this Court enter a declaration that the Act violates the First Amendment as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

### COUNT IV
### *Md. Const., Decl. Rts., Art. 40; 28 U.S.C. § 2201 (Compelled Speech)*

122.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

123.    Article 40 of the Maryland Constitution, Declaration of Rights protects the right "to speak, write and publish [one's] sentiments on all subjects."  Md. Const., Decl. Rts. art. 40.  Article 40 is "co-extensive" with the First Amendment.  *See Jakanna Woodworks*, 689 A.2d at 70.

124.    Under Maryland law, "an officer of the State acting under color of his official authority may be enjoined from enforcing a State law claimed to be repugnant to the State or Federal Constitution."  *Davis*, 37 A.2d at 885.

125.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

126.    The Act violates the Article 40 right of freedom of speech of REAL members and their subsidiaries by compelling them to speak in ways that would alter their current speech and that they do not wish to alter their current speech—requiring them to describe RECs as representing a "social good," to describe the environmental benefits of the State's preferred definition of "green power," and to explain misleadingly the relationship between RECs and the electricity underlying them.

127.    Because the Act's compelled-speech mandate requires REAL members and their subsidiaries to alter their current speech to utter a particular message, it is a content-based speech mandate.

128.    Maryland has no compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does.  REAL members and their subsidiaries already explain the nature of their product in their own accurate and truthful terms, they accurately and truthfully explain the environmental benefits of their existing product, and they explain the nature of their product accurately and truthfully.

129.    Even if Maryland had a compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does, the Act's mandates are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it compels speech from all renewable residential electricity suppliers without regard for whether all such suppliers' current disclosures are inadequate.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose products could cause consumer confusion without mandatory disclosures.  And Maryland has alternative means

of serving whatever interest it ostensibly has in the compelled-speech requirement, such as disclosure requirements that allow renewable residential electricity suppliers to explain in their own terms the nature of their product so long as the explanation is accurate and truthful, to accurately and truthfully explain the environmental benefits of their existing product rather than the State's definition of "green power," and to explain the nature of their product accurately and truthfully.

130.    Accordingly, the Act is unconstitutional under Article 40, and Plaintiffs request that this Court enter a declaration that the Act violates Article 40 as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## COUNT V
### U.S. Const. art. I, § 8, cl. 3; 42 U.S.C. § 1983; 28 U.S.C. § 2201 (REC requirements)

131.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

132.    Under Article I, Section 8, Clause 3 of the U.S. Constitution, Congress is vested with authority "[t]o regulate Commerce . . . among the several States."

133.    "[T]his language . . . contain[s] a further, negative command, known as the dormant Commerce Clause," prohibiting certain state economic regulations "even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

134.    The Dormant Commerce Clause "confers 'rights, privileges, or immunities' within the meaning of [42 U.S.C.] § 1983." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991).

135.    Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . of any State . . . , subjects, or caused to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in a[] . . . suit in equity[] or other proper

proceeding for redress."  Under § 1983, an injured party may obtain prospective relief against a "state official in his or her official capacity" to restrain the violation of constitutional rights.  *See Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. at 159–60).

136.     Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

137.     The Act violates the Dormant Commerce Clause by prohibiting the RECs of renewable energy generation sources outside the Maryland region from counting towards the 51% "green power" REC requirement but permitting the RECS from renewable energy generation sources in the Maryland region to count towards the 51% "green power" REC requirement.

138.     This prohibition discriminates against interstate commerce.

139.     This prohibition also imposes burdens on interstate commerce that are clearly excessive in relation to any putative local benefit.  Renewable residential electricity suppliers such as REAL members and their subsidiaries comply with the Green Guides and the laws of other states in describing their products—grid electricity paired 100% with RECs, the majority of which are not RPS eligible in Maryland—as "green power."  And RECs that come from generation sources that are not RPS-eligible provide the same benefits with respect to climate-change mitigation that RECs from generation sources that are RPS-eligible do.  Nevertheless, the Act substantially burdens the ability of renewable residential electricity suppliers such as REAL members and their subsidiaries to obtain their RECs from the current generation sources outside the Maryland region from which they currently obtain their RECs.

140.     Accordingly, the Act is unconstitutional under Article I, Section 8, and Plaintiffs request that this Court enter a declaration that the Act violates Article I, Section 8, as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## COUNT VI
### 28 U.S.C. § 2201 (Inseverability)

141.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

142.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

143.    The Act "created two different markets" for residential electricity supply in Maryland. *March House Hearing*, *supra*, at 08:00–08:25 (Testimony of Sen. Augustine).  The standard market restricts residential electricity suppliers from charging customers more than the default local utility's average price over the prior twelve months for its default service.  But because of "additional costs" associated with supplying renewable energy, *see id.* at 16:40–16:50 (Testimony of Sen. Augustine), the "green power" market allows renewable residential electricity suppliers to exceed that price cap.

144.    In all the foregoing ways, the "green power" market created by the Act is unconstitutional and its implementation and enforcement must be enjoined.

145.    In Maryland, an "entire act must fall" when its provisions are "so connected that it cannot be presumed that the Legislature would have passed one without the other."  *Park v. Bd. of Liquor License Comm'rs for Balt. City*, 658 A.2d 687, 695 (Md. 1995) (internal quotation marks omitted).

146.    That is true when an unconstitutional provision of a statute came in as an amendment to the original bill, as is true of the Act's "green power" provisions.  *See Muller v. Curran*, 889 F.2d 54 (4th Cir. 1989) (applying Maryland law).

147.    That is also true when an unconstitutional provision of a statute is an exception to a prohibition, as is true of the Act's "green power" provisions that function as an exception to the

standard market's price caps. *See, e.g.*, *Burning Tree Club, Inc. v. Bainum*, 501 A.2d 817, 831 (Md. 1985).

148.    Accordingly, the Act's unconstitutional "green power" provisions are inseverable from the remainder of the Act, and Plaintiffs request that this Court enter a declaration that the Act is inseverable as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand a declaratory judgment against Defendants that the Act is unconstitutional and inseverable; preliminary and permanent injunctive relief preventing the implementation and enforcement of the Act; attorneys' fees, costs, and interest; along with all other appropriate relief that this Court may determine is warranted.

Date: October 1, 2024

Respectfully submitted,

*/s/ Jeremy J. Broggi*
Thomas M. Johnson, Jr.
   *Application for Admission Pending*
Stephen J. Obermeier
   *Application for Admission Pending*
Jeremy J. Broggi (MD Bar No. 14968)
William K. Lane III
   *Application for Admission Pending*
Krystal B. Swendsboe (MD Bar No. 30839)
Joel S. Nolette (MD Bar No. 30920)
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
T: (202) 719-7000
F: (202) 719-7049
tmjohnson@wiley.law
sobermeier@wiley.law
jbroggi@wiley.law
wlane@wiley.law
kswendsboe@wiley.law
jnolette@wiley.law

*Attorneys for Plaintiffs*