**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

|  |  |
|---|---|
| RETAIL ENERGY ADVANCEMENT LEAGUE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland, *et al.*,<br><br>    Defendants. | Civil Action No. 1:24-cv-2820 |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES .....................................................................................................ii

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................4

I.      Plaintiffs and the National Renewable Energy Market ...................................4

II.     Maryland Senate Bill 1 ....................................................................................7

ARGUMENT............................................................................................................................10

I.      Plaintiffs Are Entitled to a Preliminary Injunction.......................................10

A.     Plaintiffs Are Likely to Succeed on the Merits Because the Act Violates the First Amendment and Article 40........................................................................10

1.    The Act Regulates Plaintiffs' Speech. .........................................................11

2.    The Act's Speech Regulations Are Subject to Strict Scrutiny. ...................14

3.    The Act Is Unsupported by Any Compelling or Substantial Interest.........18

4.    The Act Is Inadequately Tailored. ...............................................................20

B.     Plaintiffs Will Suffer Irreparable Injury Absent an Injunction...................23

C.     The Balance of the Equities and Public Interest Favor Injunctive Relief. .................25

II.     The Entirety of the Act Must Be Enjoined. .................................................26

CONCLUSION........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)........................................................................................................22

*Ashton v. Brown*,
  660 A.2d 447 (Md. 1995) ...............................................................................................29

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020)...........................................................................................10, 15–16

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984)........................................................................................................22

*Burning Tree Club, Inc. v. Bainum*,
  501 A.2d 817 (Md. 1985) ..........................................................................................28, 30

*Cent. Radio Co. v. City of Norfolk*,
  811 F.3d 625 (4th Cir. 2016) .........................................................................................14

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) .............................................................................10, 22, 25

*Citizens United v. FEC*,
  558 U.S. 310 (2010)........................................................................................................22

*Curtis v. Mactier*,
  80 A. 1066 (Md. 1911) ...................................................................................................30

*Davis v. State*,
  451 A.2d 107 (Md. 1982) ...............................................................................................27

*DiPino v. Davis*,
  729 A.2d 354 (Md. 1999) ...............................................................................................10

*Elrod v. Burns*,
  427 U.S. 347 (1976)........................................................................................................23

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) .........................................................................................24

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
  721 F.3d 264 (4th Cir. 2013) .........................................................................................17

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
   879 F.3d 101 (4th Cir. 2018) ...............................................................................22

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
   585 U.S. 878 (2018)................................................................................................25

*Kimberly-Clark Corp. v. District of Columbia*,
   286 F. Supp. 3d 128 (D.D.C. 2017) ......................................................................21

*Leavitt v. Jane L.*,
   518 U.S. 137 (1996)................................................................................................27

*Legend Night Club v. Miller*,
   637 F.3d 291 (4th Cir. 2011) ...........................................................................25–26

*Linmark Assocs., Inc. v. Willingboro Twp.*,
   431 U.S. 85 (1977)..................................................................................................22

*Mass. Ass'n of Priv. Career Sch. v. Healey*,
   159 F. Supp. 3d 173 (D. Mass. 2016) ...................................................................22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*,
   756 F.2d 1048 (4th Cir. 1985) ...............................................................................24

*Muller v. Curran*,
   889 F.2d 54 (4th Cir. 1989). ..................................................................................28

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
   22 F.3d 546 (4th Cir. 1994) ...................................................................................24

*In re Murphy-Brown, LLC*,
   907 F.3d 788 (4th Cir. 2018) .................................................................................23

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018)...........................................................................................15, 17

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) .................................................................................10

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................25

*O. C. Taxpayers for Equal Rts., Inc. v. Mayor & City Council of Ocean City*,
   375 A.2d 541 (Md. 1977) .......................................................................................28

*Park v. Bd. of Liquor License Comm'rs for Balt. City*,
   658 A.2d 687 (Md. 1995) .......................................................................................27

iii

*Planned Parenthood S. Atl. v. Wilson*,
  26 F.4th 600 (4th Cir. 2022) ........................................................................................26

*Police Comm'r of Balt. City v. Siegel Enters., Inc.*,
  162 A.2d 727 (Md. 1960) ..............................................................................................30

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)..............................................................................14–15, 17–18, 20

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988).......................................................................................................22

*Rivero v. Montgomery Cnty.*,
  259 F. Supp. 3d 334 (D. Md. 2017)...............................................................................10

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ........................................................................................25

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)................................................................................15, 17–18, 20

*State v. Schuller*,
  372 A.2d 1076 (Md. 1977) ............................................................................................29

*Storck v. City of Balt.*,
  61 A. 330 (Md. 1905) ....................................................................................................30

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002)..............................................................................................18, 20

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)...................................................................................................16–17

*Turner v. State*,
  474 A.2d 1297 (Md. 1984) ............................................................................................30

*United States v. United Foods, Inc.*,
  533 U.S. 405 (2001).......................................................................................................18

*Vidal v. Elster*,
  602 U.S. 286 (2024).......................................................................................................14

*Wheeler v. State*,
  380 A.2d 1052 (Md. 1977) ............................................................................................30

*X Corp. v. Bonta*,
  No. 24-271, 2024 WL 4033063 (9th Cir. Sept. 4, 2024) ..............................................17

iv

**Statutes**

Md. Code, Gen. Provs. § 1-210 .....................................................................................27

Md. Code, Pub. Util. § 7-510......................................................................................8

Md. Code, Pub. Util. § 7-707....................................................7–8, 13, 15–16, 20–21, 23

Md. Code Regs. § 20.61.04.01......................................................................................18

**Other Authorities**

16 C.F.R. Part 260...........................................................................................................6

16 C.F.R. § 260.15 ................................................................................................5–6, 19

Aman Azhar, *Twenty-Five Years After Maryland Deregulated Its Retail Energy
    Market, a Huge Win Looms for Energy Justice Advocates*, Inside Climate
    News (May 8, 2024) .............................................................................................9, 27

Brian White, *Maryland Senate Oks Consumer Protection Bill for Residential
    Energy Customers*, AP News (Mar. 8, 2024) ..............................................................6

Center for Resource Solutions, *The Legal Basis for Renewable Energy
    Certificates* (2023) ..................................................................................................19

EPA, *Renewable Energy Certificate Monetization*.........................................................5

EPA, *Renewable Energy Certificates* ...............................................................5–6, 19

EPA, *U.S. Renewable Electricity Market* .....................................................................12

*Hearing Before the House Econ. Matters Comm.* (Mar. 26, 2024) .....................9, 27–28

Md. Const., Decl. Rts., art. 40........................................................................................10

U.S. Const. amend. I .......................................................................................................10

The White House Council on Environmental Quality, *Federal Greenhouse Gas
    Accounting & Reporting Guidance* (Rev. 1, June 2012) ..........................................19

**<u>INTRODUCTION</u>**

The Maryland Legislature has adopted an environmental speech code that will prevent renewable residential electricity suppliers from truthfully and accurately marketing their renewable energy products to Maryland consumers, while dramatically reducing the clean energy available in Maryland.  Plaintiff Retail Energy Advancement League ("REAL") represents competitive energy providers in Maryland—including CleanChoice Energy, Inc. and NRG Energy, Inc. ("NRG"), the parent corporation of Plaintiff Green Mountain Energy Company ("Green Mountain")—who market residential energy backed by Renewable Energy Certificates ("RECs"), which represent power generated by renewable energy sources such as wind or solar.  By touting the environmental benefits of their products, REAL members for more than a decade have promoted consumer choice in Maryland and encouraged renewable energy generation for nearly 300,000 consumers.

But now, through 2024 Senate Bill 1, signed into law on May 9, 2024 ("the Act"), Maryland has prohibited REAL members and their subsidiaries from using a host of qualitative and accurate terms to describe their existing retail energy products—from "renewable" to "green" to "clean" to "eco-friendly" to "environmentally responsible"—while compelling those same companies to make state-sanctioned disclosures.  These prohibited and compelled speech provisions violate the First Amendment to the U.S. Constitution and Article 40 of the Maryland Declaration of Rights.  The law must be enjoined by **<u>December 1, 2024</u>**, to prevent immediate and irreparable injury to REAL members and their subsidiaries who must make significant changes to their marketing and product offerings before the speech regulations take effect on January 1, 2025.

The burden on the constitutional rights of REAL members and their subsidiaries is substantial.  These companies truthfully and accurately use terms like "green" or "clean," consistent with the Federal Trade Commission's ("FTC") Green Guides and state law, to refer to the

renewable energy like wind or solar represented by RECs. And they use Maryland's prohibited language to advertise a variety of environmental benefits for consumers, including reducing carbon emissions and combating climate change. But the Act prohibits such speech, on pain of civil penalties, unless a retail energy provider agrees with Maryland's preferred conception of clean energy and complies with an onerous laundry list of conditions on the marketing of green power products.

The requirements Maryland attaches to the exercise of protected speech are extreme. For example, providers cannot market their products as "renewable" unless they agree with Maryland's restrictive definition of the term based on the use of local RECs, even though other RECs excluded by the Act can truthfully be called renewable under federal law and the law of other states. Providers must also obtain advance approval from the Maryland Public Service Commission ("PSC") for the prices they charge for green power products, while tying those prices to costs, before engaging in prohibited marketing. Worse, the statute provides no process or timetable for the PSC to approve prices, nor does any such process currently exist. Absent such approval, a retail energy provider must match the price offered by the incumbent monopolist utility from the preceding twelve months—a government-regulated price that would effectively drive many retailers out of the market and reduce the amount of renewable energy offered in Maryland. And for those providers that remained, they *still* could not differentiate themselves from the default utility provider by advertising their REC-based products. Adding insult to injury, renewable energy providers must make a series of mandatory disclosures regarding the "social good" embodied by RECs and the environmental benefits of Maryland's "green power" mandates, rather than market products as they deem fit.

In short, to avoid the crippling economic consequences of the Act and to market popular green products that they have offered in Maryland to consumers for more than a decade, retail energy providers must adhere to the government's vision of what the terms "renewable" and "green" mean, make disclosures supporting that vision, and satisfy a rate-approval process that has not yet been created.

This law must be enjoined. Plaintiffs are likely to succeed on the merits of their First Amendment and Article 40 claims, because the Act violates REAL members' and their subsidiaries' freedom of speech in two separate ways. *First*, the Act is a content-, speaker-, and viewpoint-based speech restriction that prohibits discussion of "green" or "renewable" energy unless that speech aligns with Maryland's own views of renewable energy. The Act burdens Plaintiffs' speech by dictating how and what they can say about their renewable energy products, while forcing them into a more restrictive, price-capped market if they do not conform. *Second*, the Act unconstitutionally compels Plaintiffs' speech by requiring disclosure of non-factual, controversial opinions regarding the social good or environmental benefit of a particular renewable energy product that are inaccurate or that they do not wish to convey. Both types of regulation—those prohibiting speech and those compelling it—are subject to strict constitutional scrutiny, and the Act's sweeping speech restrictions cannot be justified by any purported interest in consumer protection.

Plaintiffs will also undoubtedly suffer irreparable harm. First Amendment burdens, like those imposed by the Act, are *per se* irreparable. And the penalty for non-compliance with the Act's speech code—inability to market renewable products to prospective clients and dramatic reduction in the competitive renewable energy business due to canceling existing customer contracts and forfeiting customers back to the local monopolist utilities—far exceeds any loss that could be remedied by money alone. The balance of the equities further supports enjoining the Act,

3

as Plaintiffs' immediate injuries cannot be outweighed by any interest Maryland may have in seeing the law enforced, as an injunction would merely temporarily maintain the status quo that has prevailed in the State for more than a decade.

Finally, because severing the marketing restrictions would subject renewable energy providers to a price cap that the Maryland Legislature intended to reserve to other products (including providers of standard offer or "brown" service), the entire statute must be enjoined.  The text, purpose, and legislative history of the Act all show that the Legislature intended to create a "separate market" for green energy (as unlawfully defined by the State) that would allow providers to charge consumers a premium for renewable products, which are typically costlier to generate.  But the means Maryland chose to purportedly facilitate that green power market—prohibiting and compelling speech—is unconstitutional.  The Legislature desired to provide preferential regulatory treatment to green power to increase renewable energy production in Maryland, so it cannot follow that it would have enacted a statute where green energy providers had to abide by the reduced rate cap put in place for the incumbent utility.  Under Maryland law, where an exception to a rule is unlawful, and the effect of severance would be to subject an exempted class of people to a prohibition, contrary to legislative intent, the entire statute must be vacated.  Accordingly, the Act as a whole should be preliminarily enjoined.

## BACKGROUND

### I.    PLAINTIFFS AND THE NATIONAL RENEWABLE ENERGY MARKET

REAL is a national advocacy organization dedicated to the expansion and modernization of American retail energy markets and is at the forefront of helping consumers obtain cost-efficient, renewable energy options.  REAL's members include residential electricity supply retailers

like NRG and CleanChoice.[1]  Green Mountain, a wholly owned subsidiary of NRG, is the nation's longest-serving renewable energy retailer and a residential electricity supply retailer in Maryland.[2] Similarly, CleanChoice is one of the nation's largest independent retail energy providers that exclusively offers its customers 100% renewable energy products, and it is a residential electricity supply retailer in Maryland.[3]

REAL members and their subsidiaries provide renewable energy supply products backed by RECs.  A REC is a tradeable commodity representing the environmental attributes of a generation source—used by many customers to substantiate their claims of voluntary renewable energy purchases, and recognized under both federal and state law—equal to one megawatt-hour of electricity generated by a renewable energy generation resource like wind or solar and introduced within the U.S. electricity grid.[4]  The REC is thus separate from the energy itself.  Once a REC is sold, the renewable attributes of the energy are transferred to the REC purchaser and are typically paired with specific energy offerings in order to denote the "renewable" quality of the energy product.[5]  RECs therefore represent the generation of renewable energy—a necessary construct because electrons in the electricity grid cannot be traced[6]—and energy products that bundle traditionally generated electricity with, or solely contain, RECs are considered "renewable."[7]  In

---

[1] Ex. 1, Declaration of Christopher Ercoli ¶¶ 10–11 ("REAL Dec.").

[2] Ex. 2, Declaration of Michael Rombach ¶¶ 3, 8, 12 ("Green Mountain Dec.").

[3] Ex. 3, Declaration of Christyna Nagle ¶¶ 8–10 ("CleanChoice Dec.").

[4] *See* EPA, *Renewable Energy Certificate Monetization*, https://www.epa.gov/greenpower/renewable-energy-certificate-monetization.

[5] *See* 16 C.F.R. § 260.15(a), (c)–(d), Example 5.

[6] *See, e.g.*, EPA, *Renewable Energy Certificates (RECs)*, https://www.epa.gov/green-power-markets/renewable-energy-certificates-recs ("EPA, *RECs*") (last visited Sept. 26, 2024) ("Because the physical electricity we receive through the utility grid says nothing of its origin or how it was generated, RECs play an important role in accounting, tracking, and assigning ownership to renewable electricity generation and use.").

[7] *See id.* ("On a shared grid—whether the electricity comes from on-site or off-site resources—RECs are the instrument that electricity consumers must use to substantiate renewable electricity use claims.").

essence, "RECs are the instrument that electricity consumers must use to substantiate renewable electricity use claims."[8]

It is common practice to use the term "renewable energy" to describe REC-backed products. Indeed, the FTC Green Guides ("Green Guides"), a federal publication designed to help energy providers and producers avoid making misleading claims regarding energy generation, 16 C.F.R. Part 260, recognize that RECs are the lynchpin to substantiating advertising claims about renewable energy. The Green Guides allow companies to market their products as "made with renewable energy" where the company matches usage with RECs, regardless of the source or type of renewable energy at issue. 16 C.F.R. § 260.15(a), (c). Indeed, the national REC market is vital to the advancement of renewable energy, as more than half of U.S. states, including Maryland, have instituted Renewable Portfolio Standards ("RPS") to encourage and promote renewable energy production and use.

Until recently, Maryland has allowed Plaintiffs to participate in the national REC market and to market and sell renewable energy to Maryland citizens. In Maryland, customers have had the choice to purchase their electricity supply from their utility or from a competitive supplier. Competitive suppliers, including REAL members and their subsidiaries, offer customers additional products with benefits beyond what they can receive from their local utility, including the option to pay more to support renewable energy.[9] Under this regime, the retail electric market flourished, and the renewable energy market took off in Maryland, as approximately 200,000 consumers opted to pay higher rates to purchase renewable or green energy products.[10]

---

[8] *Id.*

[9] *See* Green Mountain Dec. ¶ 27; CleanChoice Dec. ¶ 24.

[10] Brian White, *Maryland Senate Oks Consumer Protection Bill for Residential Energy Customers*, AP News (Mar. 8, 2024), https://apnews.com/article/electricity-rates-consumer-protection-5a1372c1531b36b63f45f26337d08bc1.

Consistent with industry practice and the FTC Green Guides, REAL members and their subsidiaries source RECs from the national market and market their REC-backed electricity products as "green," "renewable," "pollution-free," "clean," "eco-friendly," or other similar terms.[11] They do so to highlight the "environmental benefits" that come from their products, which in the words of Green Mountain's marketing materials, "[h]elp[] preserve and protect the environment for future generations."[12]  As Green Mountain explains, renewable energy "[d]oesn't emit carbon dioxide (CO2), mercury, nitrogen oxides (NOx), sulfur dioxide (SO2) or particulate matter into the air, water or soil," the "commonly cited effects" of which "include climate change, mercury poisoning, smog, acid rain and respiratory disease."[13]

## II.  MARYLAND SENATE BILL 1

The Act dramatically changes this landscape.  Foremost, the Act prohibits REAL members and their subsidiaries from accurately using specific terms to advertise their energy products as "clean, green, eco-friendly, environmentally friendly or responsible, carbon-free, renewable, 100% renewable, 100% wind, 100% hydro, 100% solar, 100% emission-free, or similar claims" unless they abide by Maryland's own definition of "green power."[14]  Specifically, to market products as green or clean, renewable electricity suppliers must provide at least 51% ordinary grid electricity backed by Maryland's own preferred RPS-eligible RECs.[15]  That is, Maryland prohibits the truthful and accurate use of "green power" terms under threat of penalty, unless a provider uses that language solely in connection with a specific mix of local RECs blessed by the State in the Act.

---

[11] *See* CleanChoice Dec. ¶¶ 12, 15, 17–18; Green Mountain Dec. ¶¶ 15, 18, 20–21.
[12] *See* Green Mountain Dec. ¶¶ 24, 44; *see also* CleanChoice Dec. ¶ 22.
[13] *See* Green Mountain Dec. ¶ 24; *see also id.* (explaining that Green Mountain's "clean electricity" helps "mitigate the effects of climate change").
[14] Md. Code, Pub. Util. § 7-707(a).
[15] *Id.* § 7-707(c)(1) (emphasis added).

The "green power" exception also compels speech.  Specifically, the Act requires all providers of green power to include a disclosure stating that:

> We deliver energy through the purchase of Renewable Energy Credits (RECs). A REC represents the social good that accompanies 1 megawatt-hour of renewable electricity generation. RECs may be sold separately from renewable electricity itself. Renewable electricity and RECs may be sold to different entities. The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.[16]

The Act mandates additional disclosures as well, pending implementation by PSC regulation, including "what the customer will actually be paying for when the customer purchases green power" and "how the green power will benefit the environment."[17]  The current draft regulations (which were filed on September 9, 2024), however, do not provide any clarity or explanation of what these disclosure obligations entail or what "benefit" Maryland requires to be disclosed, which would leave the PSC with unbridled discretion to decide whether such disclosures are adequate.[18]

Even if an energy supplier was willing to comply with the Act's speech code, it still may not market or sell the State's preferred "green" or "renewable" offerings without first obtaining advance approval from the PSC of its proposed rates and demonstrating to the PSC's satisfaction that those rates are based on the "actual cost of the green power."[19]  Absent such approval, retail energy providers would be forced to offer service at the reduced, price-capped rate based on the incumbent monopolist utility's standard (or "brown") service rate.[20]  This rate cap would make it difficult, if not impossible, for many retail energy providers to continue to offer their renewable products to consumers in Maryland.[21]  And the application and price approval process envisioned

---

[16] *Id.* § 7-707(f).
[17] *Id.* § 7-707(g).
[18] *Id.* § 7-707(h); *see also* REAL Dec. ¶ 26; *id.* Ex. 1.
[19] Md. Code, Pub. Util. § 7-707(d)(4).
[20] *Id.* § 7-510(d)(2)(i), (v); *see also id.* § 7-707(c).
[21] *See generally* Green Mountain Dec. ¶¶ 34–36, 38; CleanChoice Dec. ¶¶ 29–32, 34–35.

8

for the "green power" market currently offers no escape, as that process has not yet been established.[22]  As of today, *no* energy suppliers may satisfy the so-called green power exception or use the common, nationally accepted terms for marketing renewable energy products.  Even if a renewable electricity supplier wishes to continue truthfully marketing its existing renewable energy mix at the utility price (a substantial price cut), it *still* cannot market those products as "green power."  Accordingly, REAL members and their subsidiaries must make significant changes to their marketing and product offerings, beginning on December 1, 2024, in order to comply with the Act's restrictions.

The Maryland Legislature apparently did not intend to decimate the State's green power market when it adopted the Act.  As the bill's sponsor, Senator Augustine, explained, the law was designed to "create[] two different markets": a baseline, price-capped market tied to the incumbent utility's "brown" product and a "green power products market that . . . may exceed that price cap."[23]  Senator Augustine separately remarked that "we want to encourage renewable energy" and that "Marylanders are willing to pay a little bit more for that."[24]  Another supportive legislator remarked that "the green power market is critically important," and "we want to continue to encourage folks to be in that market."[25]  But the Act does the opposite—it unlawfully restricts and penalizes Plaintiffs' rights to free speech, thus providing Maryland consumers with less information, less choice, and less access to clean energy.

---

[22] REAL Dec. ¶¶ 23. 26; *id.* Ex. 1; *see also* Green Mountain Dec. ¶ 37; CleanChoice Dec. ¶ 33.

[23] *Hearing Before the House Econ. Matters Comm.*, at 08:00-08:25 (Mar. 26, 2024) ("*March House Hearing*"), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=ecm&clip=ECM_3_26_2024_meeting_1&ys=2024rs (Testimony of Sen. Augustine).

[24] *See* Aman Azhar, *Twenty-Five Years After Maryland Deregulated Its Retail Energy Market, a Huge Win Looms for Energy Justice Advocates*, Inside Climate News (May 8, 2024), https://insideclimatenews.org/news/08052024/maryland-retail-energy-market-justice/ ("Azhar, *Twenty-Five Years*").

[25] *March House Hearing*, *supra*, at 14:15–14:25, 14:55–15:02 (Statement of Del. Boafo).

## ARGUMENT

**I.**     **PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.**

The Court may grant a preliminary injunction when a party demonstrates "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 254 (4th Cir. 2003) (vacating denial of preliminary injunction).  Because all four factors favor Plaintiffs, they are entitled to preliminary relief.

### A.     Plaintiffs Are Likely to Succeed on the Merits Because the Act Violates the First Amendment and Article 40.

The First Amendment of the United States Constitution prohibits Maryland from "abridging the freedom of speech."  U.S. Const. amend. I.  Article 40 of the Maryland Declaration of Rights protects the right "to speak, write and publish [one's] sentiments on all subjects."  Md. Const., Decl. Rts., art. 40.

The Act violates the First Amendment and Article 40.  "Above 'all else, the First Amendment means that government' generally 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020) (plurality opinion) (quoting *Police Dept. of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).  "The freedoms protected by Article 40 are co-extensive with those protected by the First Amendment."  *DiPino v. Davis*, 729 A.2d 354, 367 (Md. 1999); *see Rivero v. Montgomery Cnty.*, 259 F. Supp. 3d 334, 349 (D. Md. 2017).  The Act abridges these fundamental freedoms because it imposes burdens that, at bottom, are designed to punish retail energy providers for expressing

views about sustainable and environmentally friendly energy production that differ from Maryland's views on these topics.

### 1.     The Act Regulates Plaintiffs' Speech.

The Act restricts speech by REAL members and their subsidiaries. They believe that empowering consumers to choose affordable and clean energy sources will drive a national and local transition to a clean energy economy and thus "[h]elp[] preserve and protect the environment for future generations."[26] As Green Mountain explains, renewable energy can help reduce carbon and other emissions and thus combat such harms as "climate change, mercury poisoning, smog, acid rain and respiratory disease."[27] REAL members and their subsidiaries educate consumers about these myriad health, environmental, and social benefits of clean energy and contribute to these goals by sourcing RECs in the national renewable energy marketplace, offering them to retail customers at a premium as an alternative to standard offer utility service.

That requires marketing: creating interest and awareness through advocacy. Specifically, REAL members and their subsidiaries use truthful, accurate terms that consumers understand—words like "green," "renewable," "pollution-free," "clean," "100% clean," "renewable," "100% renewable," "eco-friendly," "carbon-free," "100% wind," "100% wind and solar," and "environmentally responsible"—to communicate all the ways that these REC-backed clean energy products benefit the environment. Although REAL members' and their subsidiaries' usage of these terms is accurate and truthful and consistent with the way the federal government and consumers understand them, the Act prohibits electricity suppliers (with notable exceptions) from using these words except to describe Maryland's preferred local energy mix and, even then, only with Maryland's

---

[26] Green Mountain Dec. ¶¶ 24, 27–32, 44; CleanChoice Dec. ¶¶ 22, 24–27, 42.
[27] Green Mountain Dec. ¶ 24; *see also id.* (explaining that Green Mountain's "clean electricity" helps "mitigate the effects of climate change").

express prior approval. The effect is to prohibit REAL members and their subsidiaries from using truthful, accurate terms in their communications about their clean energy products.

For Green Mountain, the Act's restrictions go to the heart of how it holds itself out to the public, its business partners, customers, and potential customers. Green Mountain is the longest-serving renewable energy retailer in the United States.[28] Everything the company does is designed to help "make the planet a cleaner, greener place to live."[29] That includes Green Mountain's current offerings in Maryland's residential electricity market, which it accurately markets as "renewable" and "100% clean" because they are carbon-neutral offerings that combat the effects of global climate change and are fully backed by the purchase of RECs in the U.S. renewable electricity market.[30] Green Mountain offers "Maryland residents Pollution Free™ electricity, made from 100% renewable wind resources in the United States."[31] Yet, under the Act, Green Mountain would be prohibited from calling itself "green" or describing its offerings using terms like "100% clean" or "renewable" because its offerings use national RECs to support its claims rather than the local RECs favored by the Act.

The same is true for REAL member CleanChoice. CleanChoice is a mission-driven, clean-tech company that aims to make it easy for everyone, everywhere, to choose clean electricity supply.[32] It is one of the largest independent retail energy providers in the country that exclusively offers its customers "100% renewable energy products," and it is one of the top five largest residential electricity suppliers in Maryland.[33] Like Green Mountain, CleanChoice—whose name also includes the prohibited term "clean"—similarly describes and markets its products as "clean,"

---

[28] *Id.* ¶ 8.

[29] *Id.* ¶ 9.

[30] *Id.* ¶¶ 9–10, 14, 18; *see also* EPA, *U.S. Renewable Electricity Market,* https://www.epa.gov/green-power-markets/us-renewable-electricity-market.

[31] Green Mountain Dec. ¶ 18(g).

[32] CleanChoice Dec. ¶ 6.

[33] *Id.* ¶¶ 8, 10.

"100% clean," "pollution-free," "100% pollution free," "green," "100% renewable," "sustainable," and "eco-friendly."[34]   Yet, under the Act, like Green Mountain, CleanChoice would be prohibited from using these terms because its offerings do not reflect the renewable energy mix in the statute.  And the same is true for other REAL members who market their existing clean energy products using similar language that is prohibited under the Act.  For all these companies, marketing their products using terms that create interest in and awareness to the climate change crisis is essential to persuade customers to pay a premium for their more environmentally friendly products, which generally are costlier to produce than a utility's standard offering.[35]

The Act also unconstitutionally compels speech.  It requires all residential electricity suppliers seeking to offer "green power" to attest, in part: that "[a] REC represents the social good that accompanies 1 megawatt-hour of renewable electricity generation"; that "RECs may be sold separately from renewable electricity itself"; and how the purported green power (offered in conformance with Maryland's particular definition of "green power") will benefit the environment.[36] To date, the proposed regulations implementing these requirements merely parrot the disclosure language in the Act, still requiring—but leaving it up for interpretation—electricity suppliers to describe how the "green power" will "benefit the environment."[37]

These disclosure requirements burden the speech rights of REAL members and their subsidiaries, requiring them to make statements that they believe to be inaccurate or that conflict with their current truthful marketing materials on RECs.[38]  For example, Green Mountain and REAL members like CleanChoice already describe RECs accurately as representing the "environmental

---

[34] *See id.* ¶ 15.
[35] Green Mountain Dec. ¶¶ 16, 26–27; CleanChoice Dec. ¶¶ 13, 23–24.
[36] Md. Code, Pub. Util. § 7-707(f)-(g).
[37] *See* REAL Dec. ¶¶ 23, 26; *id.* Ex. 1 (proposed Md. Code Regs. § 20.53.07.07(B)(4)(c)).
[38] *See* Green Mountain Dec. ¶¶ 22(a)–(d), 23–25, 41–44; CleanChoice Dec. ¶¶ 19(a)–(c), 20–22, 38–42.

attributes" of power produced from renewable energy products; while RECs *further* various social goods, RECs do not themselves "represent" a "social good," as contemplated by the compelled speech.[39]  Green Mountain and REAL members like CleanChoice also currently describe how their energy offerings benefit the environment, as those energy offerings exist today, while under the Act, REAL members and their subsidiaries would be required to alter their speech in order to describe the environmental benefits of Maryland's own preferred definition of "green power."[40] The Act would also force REAL members and their subsidiaries, contrary to their current speech, to falsely represent that RECs and the "renewable" energy on which they are based may be "sold separately," whereas electricity cannot be accurately described as renewable unless it is paired with RECs.[41]  Thus, to take advantage of the "green power" exception, REAL members and their subsidiaries would be forced to alter their truthful and accurate messaging to align with Maryland's preferred (and idiosyncratic) views.  This constitutes an unconstitutional burden.

### 2.    The Act's Speech Regulations Are Subject to Strict Scrutiny.

In evaluating whether a speech regulation violates the First Amendment, courts "distinguish between content-based and content-neutral regulations of speech." *Vidal v. Elster*, 602 U.S. 286, 292 (2024) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016) (explaining that *Reed* "abrogated" the Fourth "Circuit's previous formulation for analyzing content neutrality"). A content-based regulation is subject to "strict scrutiny" and therefore is "presumptively

---

[39] *See* Green Mountain Dec. ¶¶ 22(a)–(d), 39; CleanChoice Dec. ¶¶ 19(a)–(c), 36.
[40] *See* Green Mountain Dec. ¶¶ 24, 44; CleanChoice Dec. ¶¶ 22, 42.
[41] *See* Green Mountain Dec. ¶¶ 22(c), 41; CleanDhoice Dec. ¶¶ 19(c), 38.

14

unconstitutional and may be justified only if the government proves that [the regulation is] narrowly tailored to serve compelling state interests." *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163).

The Act is content-based on its face. The statute identifies an expansive list of qualitative and descriptive words—"clean, green, eco-friendly, environmentally friendly or responsible, carbon-free, renewable, 100% renewable, 100% wind, 100% hydro, 100% solar, 100% emission-free, or similar," Md. Code, Pub. Util. § 7-707(a)—and then prohibits their accurate use. Specifically, the statute states that a residential electricity supplier "may not market electricity as green power" using any of more than a dozen enumerated terms "unless" the supplier uses them to mean the preferred energy mix in the Act. Md. Code, Pub. Util. § 7-707(c). And that is so even though Maryland has not shown (nor could it) that use of these terms to describe a different renewable energy mix is in any way deceptive or misleading to consumers. *See, e.g.*, *Reed*, 576 U.S. at 164 (holding sign code "content based on its face" and unconstitutional where its restrictions "depend[ed] entirely on the communicative content of the sign"); *Am. Ass'n of Pol. Consultants*, 591 U.S. at 618 (holding that a statutory prohibition on robocalls with an exception for government-debt collectors was "about as content-based as it gets" because it "favor[ed] speech made for collecting government debt over . . . other speech"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011) (concluding that a healthcare law was facially content-based because it prohibited particular information from being used in marketing, i.e., it prohibited "speech with a particular content").

The Act is also viewpoint-based. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S.

15

at 168–69 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The Act discriminates based on viewpoint because its prohibition on using terms like "green" apply only to speech that disagrees with Maryland about what constitutes "green power." But if the electricity being marketed as "green power" complies with Maryland's preferred understanding of that term, the restrictions do not apply. Maryland is thus using its regulation to favor and enforce its own view about the types of energy production that count as sustainable or environmentally friendly, and to punish and drive competing views out of both the literal Maryland energy market and the figurative marketplace of ideas.[42]

The Act's content- and viewpoint-based restrictions are underscored by its speaker-based exemptions. "[T]he [Supreme] Court has held that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" *Am. Ass'n of Pol. Consultants*, 591 U.S. at 619–20 (quoting *Reed*, 576 U.S. at 170); *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (same). Here, the Act exempts from its content- and viewpoint-based speech restrictions three types of speakers: "a community choice aggregator" ("CCA"), a supplier of "electricity to commercial retail electric customers," and "[t]he Department of General Services when the Department of General Services sells energy." Md. Code, Pub. Util. § 7-707(b). That speaker preference clearly reflects Maryland's hostility toward speech about national RECs because, under the statutes, residential retail electricity suppliers (like REAL members and their subsidiaries) cannot promote their RECs as "green energy" but CCAs, commercial suppliers, and the Department of General Services can all promote their offerings as "green energy." As a result, both the government itself and entities like CCAs that market to the same residential customers in Maryland can use the prohibited terms without restrictions—but REAL

---

[42] *See* Green Mountain Dec. ¶¶ 33–38; CleanChoice Dec. ¶¶ 28–35.

16

members and their subsidiaries cannot.  "[S]peaker-based laws" like the Act "demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner*, 512 U.S. at 658.

Like its speech restrictions, the Act's speech compulsions are also content- and speaker-based.  When a state "compel[s] individuals to speak a particular message," the state necessarily "alter[s] the content of their speech" and thus engages in content-based regulation.  *Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 766 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).  Here, as explained, the Act requires electricity suppliers to make several mandatory disclosures that are either inaccurate, conflict with what REAL members and their subsidiaries already say about their products, or both.  And by requiring these disclosures for residential suppliers that market national RECs while exempting those who market other offerings, the Act burdens only the speech Maryland disfavors.  The Act, in short, alters in a content-based and viewpoint-discriminatory manner speech by REAL members and their subsidiaries.

"In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571 (invalidating content-based restriction on pharmaceutical marketing); *see Reed*, 576 U.S. at 163 (describing content-based laws as presumptively unconstitutional).  Although laws regulating some economically motivated speech may be reviewed under intermediate scrutiny, courts have observed "the inherent 'difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.'" *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 284 (4th Cir. 2013); *see also X Corp. v. Bonta*, No. 24-271, 2024 WL 4033063, at *8 (9th Cir. Sept. 4, 2024) (applying strict scrutiny where regulated "speech communicates the terms of an actual or potential transaction" and also "go[es] further").  Here, though the Act regulates what electricity

17

suppliers say about their service offerings, those restrictions also prevent these companies from expressing their views about the types of products that are clean, green, eco-friendly, environmentally friendly, and environmentally responsible—speech that is not merely "commercial" because it does "more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). As noted above, REAL members and their subsidiaries use these terms not only to encourage consumers to pay a premium for more environmentally friendly products, but also because they believe that their carbon-neutral products help ameliorate the impact of climate change, among other social benefits. The Act prohibits them from accurately and truthfully educating the public as to these benefits to their products. Because there is more at stake than simply the terms on which service will be available, strict scrutiny applies.

### 3. The Act Is Unsupported by Any Compelling or Substantial Interest.

Even if the Act was entitled to a lower tier of First Amendment scrutiny, it is Maryland's burden to justify its content-based law. *See Sorrell*, 564 U.S. at 571–72. Maryland must prove first that the Act serves "compelling state interests," *Reed*, 576 U.S. at 163 (strict scrutiny), or, under intermediate scrutiny, "substantial" state interests, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) (intermediate scrutiny).

Maryland cannot prove any compelling or substantial state interest. While some supporters of the Act may have believed that the law's speech restrictions were necessary to prevent deception about *whether* retail electricity providers used RECs instead of generating their own energy, that putative rationale cannot support the law that the Legislature actually adopted, which effectively prevents providers from engaging in *any* marketing of the environmental benefits of their existing clean energy products.

*First*, consumers are already aware that retail electricity providers may use RECs to comply with their existing obligations under Maryland's RPS. *See* Md. Code Regs. § 20.61.04.01(b)(2).

Consistent with this mandate and because of their own well-grounded belief in the environmental benefits of RECs, REAL members and their subsidiaries accurately explain their use of RECs in their websites and promotional materials.[43]  There is simply no substantial, let alone compelling, consumer-protection interest in cutting off debate over clean energy to address an issue on which retail electricity providers are already willingly transparent.

*Second*, what REAL members and their subsidiaries say is consistent with federal guidance and is not misleading or deceptive.  RECs are commodities that "play an important role in accounting, tracking, and assigning ownership to renewable electricity generation and use."[44]  Because electricity is transmitted on a shared grid, making it impossible for most consumers to buy energy directly from renewable sources, "RECs are the instrument that electricity consumers must use to substantiate renewable electricity use claims."[45]  Far from encouraging "consumer deception," RECs are an accepted means of consumer empowerment which enable those that must use electricity from the shared grid to ensure that an amount of energy they use is generated responsibly. That contributes to the overall health of the environment by displacing energy from dirty sources.[46] That is why the FTC—the federal agency with principal responsibility for protecting U.S. consumers from deceptive marketing claims—has recognized that matching "non-renewable energy use with renewable energy certificates" is an appropriate means for substantiating renewable energy claims.  16 C.F.R. § 260.15(a).  And it is also why the EPA and numerous other federal

---

[43] Green Mountain Dec. ¶¶ 22(a)–(d), 23; CleanChoice Dec. ¶¶ 19(a)–(c), 20–21.

[44] EPA, *RECs*, *supra*.

[45] *Id.*

[46] *See also* The White House Council on Environmental Quality, *Federal Greenhouse Gas Accounting & Reporting Guidance* 27 (Rev. 1, June 2012), https://www.sustainability.gov/pdfs/federal_ghg%20accounting_reporting-guidance.pdf ("RECs are essential to claims concerning renewable energy and adjustments to GHG emissions."); Center for Resource Solutions, *The Legal Basis for Renewable Energy Certificates* 10 (2023), *available at* CleanChoice, *What Are Renewable Energy Certificates? How You Can Choose Clean Energy Through RECs*, https://cleanchoiceenergy.com/news/clean-renewable-energy-certificates-recs ("RECs are a necessary part of the machinery of U.S. electricity markets, used to demonstrate renewable electricity purchasing, delivery, and use.").

agencies and environmental advocates similarly promote RECs as a means to increase responsible energy generation.

Of course, Maryland need not agree with federal policy on RECs (or anything else).  But under the First Amendment, Maryland cannot punish electricity suppliers who express the same truthful viewpoint as the federal government simply because Maryland does not like that viewpoint.  And Maryland certainly cannot advance an anti-deception rationale when the supposedly deceptive speech in fact complies with guidance issued by the leading governmental authority on protecting consumers from deception.

### 4.    The Act Is Inadequately Tailored.

In addition to showing compelling or substantial interests, Maryland must demonstrate that the Act's speech regulations "are narrowly tailored to serve" those interests, *Reed*, 576 U.S. at 163 (strict scrutiny), or, under intermediate scrutiny, that the Act's speech regulations are carefully "drawn to achieve that interest," *Sorrell*, 564 U.S. at 572.  Under either standard, the tailoring inquiry enforces the First Amendment's requirement that "regulating speech must be a last—not first—resort." *Thompson*, 535 U.S. at 373.

Maryland cannot satisfy strict or intermediate scrutiny.  Even if Maryland could prove an adequate state interest, which it cannot, the Act regulates far more speech than necessary.  As explained, the Act contains a list of words that electricity suppliers cannot say unless they intend the same meaning shared by Maryland.  Compounding that problem, the Act requires even those electricity suppliers that do agree with Maryland on the meaning of words like "clean," "green," and "renewable" to obtain Maryland's permission before it says any of these words.  *See* Md. Code, Pub. Util. § 7-707(c) ("An electricity supplier . . . may not market electricity as green power unless . . . the Commission approves the price of the electricity being marketed as green power"); *id.* § 7-707(a) (defining "green power" as energy sources or RECs "marketed as clean, green, eco

20

-friendly, environmentally friendly or responsible, carbon -free, renewable, 100% renewable, 100% wind, 100% hydro, 100% solar, 100% emission -free, or similar").

No purported interest in preventing consumer deception could possibly justify such a sweeping restraint on participation in the marketplace of ideas. *First*, the speech restrictions apply both to energy generated directly from renewable sources *or* renewable energy credits—of course, there can be no consumer confusion about a supplier's use of RECs if the supplier is generating its own energy and not using RECs. *See* Md. Code, Pub. Util. § 7-707(c)(1). *Second*, as noted above, Maryland regulations already require retail energy providers to disclose their use of RECs in connection with the less restrictive mandatory energy mix (RPS) that is already on the books. By definition, any provider that complies with the more onerous energy mix requirement in the Act will already be making such disclosures, and in point of fact, REAL members and their subsidiaries currently do so. *Third*, if there were any lingering doubt on this score, Maryland could tweak its existing regulations to make clear that a provider needs to disclose its use of RECs with respect to any voluntary or mandatory product offerings—rather than stifle all green power marketing, as the Act currently does.

Other less speech-restrictive options for Maryland to address consumer deception abound. For example, Maryland could simply enforce its existing laws "against misleading advertising." *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 112 (4th Cir. 2018). In other words, rather than enact a list of prohibited words that cannot be uttered unless Maryland gives its prior consent, the State could focus on actual bad acts by actual bad actors and prosecute them for consumer deception. *See also Kimberly-Clark Corp. v. District of Columbia*, 286 F. Supp. 3d 128, 144–46 (D.D.C. 2017) (holding unconstitutional statute that "banned the use of the word 'flushable'" in marketing communications for "flushable

21

wipes"); *Mass. Ass'n of Priv. Career Sch. v. Healey*, 159 F. Supp. 3d 173, 206 (D. Mass. 2016) (holding marketing restriction imposed on for-profit schools "prohibits more speech than is necessary to protect students from deceptive advertisements about program-completion times"); *Riley*, 487 U.S. at 802 (holding unconstitutional a licensing regime that prohibited speakers from engaging in solicitations until obtaining a license from the state because there was no specified time period within which the state had to grant or deny license applications).

Another more carefully drawn means would be for Maryland to use its own speech to promote its views about what constitutes clean energy. For example, Maryland could conduct an education campaign about the benefits of the Act's mandatory REC mix or explaining why consumers should prefer green energy suppliers whose products contain the REC mix Maryland believes is "green." *See Greater Balt.*, 879 F.3d at 112; *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (plurality opinion) (observing that "educational campaigns focused on" the purported problem are a more tailored option than banning speech); *cf. Centro Tepeyac*, 722 F.3d at 190, 192 (affirming a preliminary injunction against a compelled-speech regime because more narrowly tailored options were available, such as "a public awareness campaign"). Under "our law and our tradition," the Supreme Court has explained, "more speech, not less, is the governing rule." *Citizens United v. FEC*, 558 U.S. 310, 361 (2010); *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504 (1984) ("Under our Constitution 'there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.'"); *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is

more speech, not enforced silence.  Only an emergency can justify repression." (citations omitted)).

The Act's compulsions are similarly overbroad.  The Act requires certain electricity suppliers seeking to offer "green power" to attest, in part, that "[a] REC represents the social good that accompanies 1 megawatt-hour of renewable electricity generation."  Md. Code, Pub. Util. § 7-707(f).  As explained above, these compelled disclosures are factually inaccurate and conflict with how REAL members and their subsidiaries currently describe their offerings.  Again, Maryland could have proposed a more targeted regulation that simply expanded the existing disclosures associated with the mandatory RPS energy mix and made clear that suppliers must disclose their use of RECs in connection with any green energy offering.  Maryland failed to adopt such a solution, however, and the resulting combination of overbroad speech restrictions and compulsions in the Act must be enjoined.

**B.**     **Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.**

The Court should enter a preliminary injunction because Plaintiffs will suffer two distinct forms of irreparable harm in the absence of preliminary relief.

*First*, "all First Amendment infringements . . . 'are per se irreparable' injuries."  *In re Murphy-Brown, LLC*, 907 F.3d 788, 801 (4th Cir. 2018).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  As discussed above, the Act unconstitutionally burdens electricity suppliers' First Amendment rights.  That is, they will no longer be able to market their renewable energy products in all the ways they currently do—calling it "green," "renewable," "pollution-free," "clean," "eco-friendly," "environmentally responsible," and other similar

23

terms.[47]  And they will be compelled to speak in several different ways that will require them to modify their speech and to speak inaccurately.[48]  The Act, therefore, inflicts irreparable harm.

*Second*, as a consequence of the Act's unconstitutional speech code, electricity suppliers will lose customers and valuable business opportunities in Maryland to standard offer or default utilities.  "[P]rospective[] . . . loss of valuable business opportunities" constitutes irreparable injury.  *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).  Further, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor," "the irreparable injury prong" of the preliminary-injunction standard "is satisfied."  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7; *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985) (affirming a preliminary injunction where the movant "faced irreparable, noncompensable harm in the loss of its customers").

Here, electricity suppliers are faced with a Hobson's choice.  On one hand, the Act prohibits Plaintiffs' use of terms like "green" and "renewable," and caps suppliers' ability to charge rates necessary to support many renewable energy offerings.[49]  As a consequence, many providers will be forced to cancel existing customers' service, suspend their marketing to prospective new customers, discontinue their renewable energy offerings in Maryland, and move business elsewhere, reducing renewable energy offerings across the board.  On the other hand, Plaintiffs have to comply with the constitutionally violative "green power" exception (which infringes and compels

---

[47] *See* CleanChoice Dec. ¶ 28; Green Mountain Dec. ¶ 33.
[48] *See* Green Mountain Dec. ¶¶ 22–24, 39–44; CleanChoice Dec. ¶¶ 19–22, 36–42.
[49] *See* Green Mountain Dec. ¶¶ 33–38; CleanChoice ¶¶ 28–35.

24

speech and conditions their speech on adherence with Maryland's viewpoint).[50]  Either way they will suffer loss and lose customers permanently.[51]

### C.    The Balance of the Equities and Public Interest Favor Injunctive Relief.

The balance of the equities and the public interest favor injunctive relief.  When the government is the opposing party, assessing the harm to the opposing party and weighing the public interest "merge."  *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because the Act violates the First Amendment, "the threatened injury to Plaintiffs easily outweighs whatever burden the injunction may impose."  *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).  On one hand, electricity suppliers face the deprivation of their First Amendment rights, which are "a fixed star in our constitutional constellation, if there is one." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 917 (2018) (internal quotation marks omitted).  On the other hand, "the State of Maryland is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302–03.  And "upholding constitutional rights is in the public interest." *Id.* at 303; *see also Centro Tepeyac*, 722 F.3d at 191 ("If anything, the system is improved by . . . an injunction" against First Amendment violations (internal quotation marks omitted)).  The balance of equities further favors the electricity suppliers, because, as an alternative to sacrificing their First Amendment rights, electricity suppliers face an unjustified "loss of valuable business

---

[50] *See* Green Mountain Dec. ¶¶ 33, 38–44; CleanChoice Dec. ¶¶ 28, 36–42.
[51] *See* Green Mountain Dec. ¶¶ 33–38; CleanChoice Dec. ¶¶ 28–35.

opportunities" in Maryland, as the Act will force them to suffer losses and lose customers permanently given the burdens it imposes. *See Legend Night Club*, 637 F.3d at 302.[52]

The Court must enjoin the Act.

## II.    THE ENTIRETY OF THE ACT MUST BE ENJOINED.

Under Maryland law, a court must strike down a statute in its entirety when the Legislature views an invalid provision as integral to the scheme and would not have intended to adopt the balance of the statute in its absence.  Relatedly, an invalid provision of a Maryland law cannot be severed where the provision is an exception to a prohibition, and striking the exception would subject a class of people to burdens that the Legislature did not intend.

Both of these principles apply here.  In adopting the Act, the Maryland Legislature intended to create two interdependent ratemaking regimes for retail energy—a default regime tied to the incumbent utility's prices and an exception for renewable energy products.  Because the exception created by the Legislature for green energy is unconstitutional, severing it from the statute would eliminate one of the two intended ratemaking regimes, while preventing retail electricity providers from charging any premium to consumers for their renewable energy products, making it difficult or impossible for them to compete in the market for standard utility service.  Because the Legislature did not intend this result, the Act must be enjoined in its entirety, to allow the Legislature to determine in the first instance how to lawfully accommodate renewable energy retailers in Maryland.  *See, e.g., Planned Parenthood S. Atl. v. Wilson*, 26 F.4th 600, 607 (4th Cir. 2022) (affirming a preliminary injunction enjoining entire statute because the unconstitutional provision was not severable), *vacated on other grounds*, 2022 WL 2900658 (4th Cir. July 21, 2022).

---

[52] *See* Green Mountain Dec. ¶¶ 33–38; CleanChoice Dec. ¶¶ 28–35.

Maryland law holds that an unconstitutional or void provision is not severable when "the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent." Md. Code, Gen. Provs. § 1-210 (2014) (derived "without substantive change" from former Md. Code, Art. 1 § 23).[53] In evaluating whether a provision is severable, Maryland courts ask "what *would have been the intent* of the legislative body, if it had known that the statute could be only partially effective." *Davis v. State*, 451 A.2d 107, 114 (Md. 1982) (quoting *Cities Serv. Co. v. Governor*, 431 A.2d 663 (Md. 1981)). An "entire act must fall," severability clause notwithstanding, "when the provisions are so connected that it cannot be presumed that the Legislature would have passed one without the other." *Park v. Bd. of Liquor License Comm'rs for Balt. City*, 658 A.2d 687, 695 (Md. 1995). "Analysis of the legislative history" of the Act "compels the conclusion that it is not severable." *Id.*

The Act's legislative history shows that its supporters wanted to encourage price competitiveness among energy providers in Maryland, but also wanted to allow consumers to pay a premium for renewable energy. The Bill's sponsor, Senator Augustine, explained that the law "created two different markets," including a baseline, price-capped market tied to the incumbent utility product and a "green power products market that . . . may exceed that price cap."[54] Senator Augustine separately said that "we want to encourage renewable energy" and that "Marylanders are willing to pay a little bit more for that."[55] And another supportive legislator said that "the green power market is critically important," and "we want to continue to encourage folks to be in that market."[56] But because the Legislature attempted to accomplish this objective through unlawful

---

[53] State law governs whether a state statute challenged in federal court is severable. *See, e.g.*, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996).

[54] *March House Hearing*, *supra*, at 08:00-08:25 (Testimony of Sen. Augustine).

[55] *See* Azhar, *Twenty-Five Years*, *supra*.

[56] *March House Hearing*, *supra*, at 14:15–14:25, 14:55–15:02 (Statement of Del. Boafo).

speech controls, severing these provisions would force green energy providers to match the price of the incumbent utility—driving many of them out of the market. The proponents of the Act did not intend this result, and thus the entire law must be enjoined.

This conclusion is confirmed by the Act's enactment history. The original version of the Act as introduced did not contain the accommodation for green energy retailers.[57] Rather, those provisions came via amendment from the State Senate Education, Energy, and the Environment Committee, and appear in the adopted version.[58] In *Muller v. Curran*, the Fourth Circuit found similar enactment history instructive in concluding that the Legislature would not have adopted the statute without the unconstitutional provision. 889 F.2d 54, 57 (4th Cir. 1989). "In that context," as here, "this Court cannot conclude that Maryland's legislature intended that if the [unlawful provisions] were to be eliminated as unconstitutional, the legislature desired the statute to survive" without the provisions governing the sale of renewable electricity. *Id.*

Relatedly, "[t]here is no presumption in favor of severability where the invalid portion of a statute is an exception to a prohibition." *Burning Tree Club, Inc. v. Bainum*, 501 A.2d 817, 831 (Md. 1985). That is, "when a statute contains both a general provision and an invalid exception, courts have often refused to sever when the severed statute would impose a duty, sanction or substantial hardship on the otherwise excepted class." *O. C. Taxpayers for Equal Rts., Inc. v. Mayor & City Council of Ocean City*, 375 A.2d 541, 550 (Md. 1977) (collecting authorities). That principle also applies here. The Maryland Legislature plainly did not intend to subject green energy providers to the same rate restrictions as other energy providers. But because the marketing

---

[57] *See March House Hearing*, *supra*, at 08:00-08:25 (Testimony of Sen. Augustine) (explaining how the bill had been amended to add this); *see generally* the Act (Oct. 11, 2023), https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/sb0001.

[58] *See March House Hearing*, *supra*, at 08:00-08:25 (Testimony of Sen. Augustine) (explaining this recent amendment to the original bill); *see generally* the Act (Mar. 5, 2024), https://mgaleg.maryland.gov/mgawebsite/Legislation/Details/sb0001.

restrictions on green energy are unconstitutional, renewable energy retailers would be forced to meet the incumbent utility's prices or exit the market, frustrating the Legislature's intent.

Similar cases in Maryland confirm that conclusion. For example, in *State v. Schuller*, the Maryland Supreme Court[59] held that it violated the First Amendment and Equal Protection Clause for the State to prohibit peaceful picketing in residential neighborhoods except in connection with a labor dispute. 372 A.2d 1076, 1077 (Md. 1977). The Court reasoned that the government "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Id.* at 1082. The Court then held that it could not sever the labor protestor exception from the remainder of the statute, explaining that "[a] holding that the residential picketing provisions are severable would extend the statutory prohibition to a class which was intended to be excepted." *Id.* at 1084. The same result applies here.

Similarly, in *Ashton v. Brown*, the Maryland Supreme Court considered a juvenile curfew ordinance in the City of Frederick that made it a misdemeanor for parents to knowingly let their children be out after the nighttime curfew. 660 A.2d 447, 451–52 (Md. 1995). The curfew, however, contained several "broad exceptions," including one for children attending certain activities supervised by an unspecified "bona fide organization." *Id.* at 452. The court held that this provision rendered the ordinance unconstitutionally vague. *Id.* at 456–58. The Court then applied "the principles of severability applicable to a prohibitory statute with an invalid exception," and concluded that severability was not possible because it "would extend the curfew to cover situations which the City Council intended to exclude from its scope, and would partially defeat the clear purpose of the ordinance." *Id.* at 459.

---

[59] At the time of the decision, and until 2022, the Maryland Supreme Court was called the Court of Appeals of Maryland.

Other examples abound. *See, e.g.*, *Burning Tree Club, Inc.*, 501 A.2d at 832 (exception for single-sex country clubs from prohibition of sex discrimination for certain tax benefits deemed not severable); *Turner v. State*, 474 A.2d 1297, 1302–04 (Md. 1984) (concluding that a law prohibiting the employment of "female sitters" violated the state Equal Rights Amendment and concluding that the statute "should be invalidated in its entirety" because severance would extend the prohibition "to males, an otherwise excepted class"); *Wheeler v. State*, 380 A.2d 1052, 1060–61 (Md. 1977) (holding that an exception to an obscenity statute violated the Equal Protection Clause and concluding that the general prohibition in the statute was inseverable); *Police Comm'r of Balt. City v. Siegel Enters., Inc.*, 162 A.2d 727, 738 (Md. 1960) (similar to *Wheeler*); *see also Curtis v. Mactier*, 80 A. 1066, 1070–71 (Md. 1911) (finding tax exemptions in a law unconstitutional and concluding that the remainder of the law was inseverable because the exemptions were "'inseparably connected with the whole scheme of the act'" (quoting *Nutwell v. Anne Arundel Cnty. Comm'rs*, 73 A. 710, 712 (Md. 1909))); *Storck v. City of Balt.*, 61 A. 330, 332, 334 (Md. 1905) (finding that an exception to a zoning law was "void for uncertainty" and concluding that the "general prohibition" was inseverable because doing otherwise would "thwart[]" the "purpose of the legislature," which "clearly intended" to have the exception in place).

These cases all point in the same direction and control the outcome here. Because the Maryland Legislature intended to create two tiers of electricity markets in the state—one for green power, and one for the price-capped other (including "brown") power—this Court cannot presume the Legislature would have collapsed both markets into one if the other were deemed unconstitutional. Accordingly, the entire statute must be enjoined.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Preliminary Injunction by **December 1, 2024**.

Date: October 1, 2024

Respectfully submitted,

*/s/ Jeremy J. Broggi*
Thomas M. Johnson, Jr.
   *Application for Admission Pending*
Stephen J. Obermeier
   *Application for Admission Pending*
Jeremy J. Broggi (MD Bar No. 14968)
William K. Lane III
   *Application for Admission Pending*
Krystal B. Swendsboe (MD Bar No. 30839)
Joel S. Nolette (MD Bar No. 30920)
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
T: (202) 719-7000
F: (202) 719-7049
tmjohnson@wiley.law
sobermeier@wiley.law
jbroggi@wiley.law
wlane@wiley.law
kswendsboe@wiley.law
jnolette@wiley.law

*Attorneys for Plaintiffs*

31

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 1st day of October, 2024, the foregoing Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, along with the accompanying Exhibits, were served on Defendants by mailing a copy thereof to:

| Anthony G. Brown | Frederick H. Hoover | Michael T. Richard |
|---|---|---|
| 200 St. Paul Place | 6 St. Paul Street, 16th Floor | 6 St. Paul Street, 16th Floor |
| Baltimore, MD 21202 | Baltimore, MD 21202 | Baltimore, MD 21202 |

| Kumar P. Barve | Bonnie A. Suchman |
|---|---|
| 6 St. Paul Street, 16th Floor | 6 St. Paul Street, 16th Floor |
| Baltimore, MD 21202 | Baltimore, MD 21202 |

Date: October 1, 2024

*/s/ Jeremy J. Broggi*
Jeremy J. Broggi

32