# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RETAIL ENERGY ADVANCEMENT LEAGUE, *et al.*, | * | |
| *Plaintiffs*, | * | |
| | * | No. 1:24-CV-2820 |
| v. | * | |
| | * | |
| ANTHONY G. BROWN, *et al.*, | * | |
| *Defendants*. | | |

\* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' JOINT OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ANTHONY G. BROWN
Attorney General of Maryland

COLIN GLYNN
Federal Bar No. 19049
Associate General Counsel
Office of General Counsel
6 Saint Paul Street
16th Floor
Baltimore, Maryland 21202

Attorney for Defendants, Frederick H. Hoover, Michael T. Richard, Kumar P. Barve, and Bonnie E. Suchman

JAMES D. HANDLEY
Federal Bar No. 20299
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
20th Floor
Baltimore, Maryland 21202

Attorney for Defendant, Anthony G. Brown

October 29, 2024

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................ 1

FACTUAL AND LEGAL BACKGROUND ............................................................ 3

I.    SINCE 1999, MARYLAND HAS HAD A COMPETITIVE ENERGY MARKET
      FOR ELECTRICITY SUPPLY. ........................................................................... 3

II.   MARYLAND'S COMPETITIVE ELECTRICITY MARKET HAS BEEN THE
      SUBJECT OF COMPLAINTS ............................................................................. 5

III.  MARYLAND ENACTED SB1 TO PROTECT RETAIL CUSTOMERS AND
      CREATE A SEPARATE MARKET FOR GREEN POWER .................................... 7

ARGUMENT.............................................................................................................. 11

I.    THE STRICT LEGAL STANDARD FOR A PRELIMINARY INJUNCTION. ...................... 11

II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF
      THEIR CLAIMS TO INVALIDATE SB 1 ......................................................... 13

      A.    THE ACT'S RESTRICTIONS ON COMMERCIAL
            SPEECH DO NOT VIOLATE THE FIRST AMENDMENT.
            ..................................................................................................... 13

      B.    SB1'S RESTRICTIONS ON COMMERCIAL SPEECH
            PASS THE INTERMEDIATE SCRUTINY TEST. ................................. 17

            1.    THE COMMERCIAL SPEECH AT ISSUE IS
                  MISLEADING. ................................................................... 17

            2.    MARYLAND HAS A SUBSTANTIAL INTEREST IN
                  CONSUMER PROTECTION. ................................................ 19

            3.    SB1 DIRECTLY ADVANCES MARYLAND'S
                  INTEREST IN STRONG CONSUMER
                  PROTECTIONS. .................................................................. 20

            4.    SB1'S RESTRICTIONS ARE NOT MORE
                  EXTENSIVE THAN IS NECESSARY. ..................................... 20

C.    THE ACT'S DISCLOSURE REQUIREMENTS DO NOT VIOLATE THE FIRST AMENDMENT. ...................................... 23

D.    DEFENDANTS ARE IMMUNE FROM SUIT IN FEDERAL COURT FOR PLAINTIFFS' MARYLAND CLAIMS. ............................................................................................. 26

II.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM FROM ENFORCEMENT OF SB1. ...................................................................... 27

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST GRANTING THE PRELIMINARY INJUNCTION. ............................................ 28

IV.    EVEN IF PLAINTIFFS' MOTION IS GRANTED, SB1 SHOULD NOT BE ENJOINED IN ITS ENTIRETY. .................................................................. 29

CONCLUSION ...................................................................................................... 30

CERTIFICATE OF SERVICE .................................................................................. 32

**INTRODUCTION**

In this case, plaintiffs challenge Senate Bill 1 ("SB1"), which is Maryland's recent legislative effort to protect consumers from misleading claims by sellers of "green" electricity. SB1 ensures that consumers who choose to pay more for electricity marketed as "green" is, in fact, "green." SB1 was adopted in response to complaints by Maryland consumers who were misled into purchasing electricity marketed as "green" or renewable energy. A copy of SB1 is attached hereto as **Exhibit 1**.

SB1 reformed the existing regulatory framework for retail electricity supply by creating a two-tiered marketplace for electricity sales: (1) electricity comparable to established utilities' (*i.e.*, BGE or PEPCO) Standard Offer Service ("SOS")[1] and subject to a lower price cap ("Regular Power") and (2) electricity which meets renewable or "green" energy standards and subject to a higher price cap ("Green Power"). SB1 prevents sellers from marketing their electricity as "green" unless the electricity being marketed meets criteria specified by SB1. SB1 also imposes disclosure requirements intended to help consumers make educated decisions when considering whether to buy, and pay more for, "green" electricity. With SB1, Maryland consumers who decide to pay more for "green" electricity can do so secure in the knowledge that the electricity meets Maryland's criteria for electricity to be sold as such.

---

[1] SOS is the default electricity supply available to all customers by their electricity utility. MD. CODE REGS. 20.52.01.01-20.52.01.05. SOS rates are market generated and approved by the Public Service Commission ("Commission").

Importantly, SB1 does not deny any retailer the ability to sell electricity to Maryland consumers at the lower, Regular Power rates. The disclosure requirements, about which plaintiffs complain, are not imposed on all retailers of electricity. Rather, such requirements are imposed only on retailers who seek to charge the higher rates allowed to be charged for "green" electricity.

SB1 also includes numerous reforms not challenged in this lawsuit, including licensing requirements applicable to energy salespersons and energy vendors, the end of commission-based compensation for salespersons, and the end of variable rate agreements.

Plaintiffs Retail Energy Advancement League ("REAL")—a trade organization representing retail energy suppliers in Maryland—and Green Mountain Energy Company ("Green Mountain")—a retail energy supplier—seek to invalidate SB1, arguing that (1) SB1 violates the First Amendment (and the analogous Maryland constitutional provision); and (2) the two-tiered marketplace violates the Dormant Commerce Clause.

Plaintiffs' motion for preliminary injunction seeks to prevent the implementation of SB1 in its entirety. Plaintiffs' motion is based solely on their claims under the First Amendment and Article 40 of the Maryland Declaration of Rights. Plaintiffs motion should be denied because:

> (1)    SB1 governs "commercial speech" under the First Amendment, meaning the challenged portions of the law need only survive intermediate scrutiny;
>
> (2)    SB1 comports with the First Amendment because it prevents misleading and deceptive sales techniques;
>
> (3)    SB1 requires disclosure of purely factual and uncontroversial information that is reasonably aimed at educating consumers, and the

disclosure requirements are imposed only on retailers who seek to market "Green Power" and charge the higher rates the Commission allows for "Green Power," as defined by Maryland law;

(4)     Plaintiffs will not suffer irreparable harm from enforcement of SB1; and

(5)     Should this Court find that some provisions of SB1 violate the First Amendment, those provisions are severable from the remainder of SB1.

## FACTUAL AND LEGAL BACKGROUND

**I.     SINCE 1999, MARYLAND HAS HAD A COMPETITIVE ENERGY MARKET FOR ELECTRICITY SUPPLY.**

Maryland law recognizes a distinction between (1) electricity distribution (via wires, which are natural monopolies and, by law, performed by a single distribution utility for each service area) and (2) electricity commodity supply (electricity generation and gas production, which permit many participants to contribute to the market). Md. Code Ann., Pub. Util. §§ 7-501 – 7-549.

That framework has been in place since 1999, when Maryland introduced retail competition and allowed third-party suppliers to sell electricity and other services to Maryland consumers. **Exhibit 2,** Fiscal and Policy Note, Enrolled-Revised Senate Bill 1, at 10. As a result, Maryland consumers may purchase electricity from their local utility, such as BGE or PEPCO, or from any number of third-party suppliers. *Id.*

Because electricity, once put into the PJM grid,[2] cannot be differentiated, Maryland (like other states) tracks whether electricity is generated from renewable sources by

---

[2] PJM is a federally designated inter-state regional power grid that includes Maryland, the District of Columbia, and twelve other states. PJM is the marketplace where

requiring suppliers to pair that power with matching Renewable Energy Credits ("RECs").

Pub. Util. § 7-703.  RECs are defined as "a credit equal to the generation attributes of 1

megawatt-hour of electricity" generated from sources located within or geographically near

PJM.[3]  Pub. Util. § 7-701(m).  Owners of renewable generation in PJM receive RECs from

the state where the generation is located and register those RECs with PJM, where they can

be sold.  Pub. Util. § 7-708; MD. CODE REGS. 20.61.03.01 - 20.61.03.04.  For each one

megawatt ("MWh") of power, generators of renewable electricity receive one MWh REC.

The interstate markets for electricity and RECs are separate.

Regardless of whether electricity is supplied by utilities or retail suppliers, all

electricity sold in Maryland must meet Maryland's Renewable Portfolio Standard ("RPS").

Pub. Util. § 7-703(b).  The RPS sets a minimum requirement for the share of total electricity

supply that must be generated from eligible renewable sources.  *Id.*

Specifically, the RPS requires utilities and retail electricity suppliers to purchase

eligible RECs equal to a statutorily designated percentage of their total electricity sales.

Pub. Util. § 7-703.  For 2025, the minimum standard under the RPS is at least 35.5 percent

from "Tier 1" renewable sources (most renewables, such as wind or solar) and at least 2.5

---

Maryland and other states in the PJM region acquire electricity.  *See* https://www.pjm.com/about-pjm/who-we-are/territory-served (last visited Oct. 29, 2024).

[3] The term Renewable Energy Credit, or REC, is used industry wide to describe a tradeable commodity.  Maryland's statutory definition in Section 7-701(m) is limited to RECs generated from renewable sources within the PJM region which incentivizes the development of renewable sources in the region from which Maryland draws its power.

Throughout their motion, plaintiffs refer to the FTC "Green Guides" as if it sets the limits the definition of RECs.  Notably, the FTC has stated that its Green Guides do not preempt state or local laws.  16 C.F.R. § 260.1(b).

percent from "Tier 2" renewable sources (a special category that includes only hydropower). Pub. Util. § 7-703(b)(20); *see also id*. §§ 7-701(s)-(t) (defining Tier 1 and Tier 2 renewable sources). Maryland law encourages the development of new RPS-eligible, renewable electricity generation within the PJM region by increasing, on an annual basis, the minimum percentage of electricity supply that must come from renewable generation. Pub. Util. § 7-703(b).

Some retailers of electricity attempt to compete directly with the utilities' SOS rates by offering lower prices for electricity that meets the required minimum RPS standard. Other retailers market products promising additional environmental benefits, such as being 100% renewable, for which they historically have charged higher rates. It is this latter type of retail offering that is addressed by the challenged provisions of SB1.

## II. MARYLAND'S COMPETITIVE ELECTRICITY MARKET HAS BEEN THE SUBJECT OF COMPLAINTS

Before the enactment of SB1, retail energy did not serve Maryland customer's needs. A 2018 report by the Abell Foundation (the "Abell Report") explained that retail supply contracts did not produce promised customer savings and instead cost Maryland customers approximately $255 million, compared to SOS, between 2014 and 2017. **Exhibit 3,** Abell Report, at 1, 10. The Abell Report also found that retail suppliers targeted low-income communities. *Id*. at 15-19. The Abell Report made several recommendations, including (1) eliminating individual retail supply contracts in favor of community aggregation; (2) eliminating variable rate contracts for residential customers; and (3) requiring individual supply contracts be "100 percent renewable." *Id*. at 22.

5

With regard to marketing of green energy, during the legislative hearings on SB1, witnesses expressed that ambiguous and misleading marketing had caused consumer confusion about and dissatisfaction with the renewable electric supply market. The Maryland Energy Advocates Coalition testified:

> In addition to the low-income targeting, "Eco-buyers" are wooed into retail energy with promises of clean electricity. Retail energy "green power" offers are based on voluntary renewable energy certificates. Maryland currently has no standards or regulations regarding "green offers" and Maryland has no visibility into what types of RECs suppliers purchase on behalf of their clients. Research suggests most RECs are unbundled RECs from Texas wind farms. These RECs are very low cost (after broker fees, too) and offer no 'environmental benefits' for Maryland.

**Exhibit 4**, Maryland Energy Advocates Coalition Testimony in Support of SB1, at 4.

One consumer testified that she enrolled with, and agreed to pay the higher rates charged by, a retail energy supplier that promised her "100% wind energy." *See* **Exhibit 5**. The witness later discovered that she was not provided with electricity directly generated by wind power, but that her supplier was purchasing RECs and pairing them with power purchased on the open market that contained a mixture of renewable and non-renewable generation sources. *Id*. The witness felt deceived by the supplier's false claims that her family would be supplied electricity generated exclusively from renewable sources. *Id.*

Another consumer, self-described as a "fierce environmentalist[]" switched from BGE to CleanChoice Energy, in part to combat global climate change. *See* **Exhibit 6**. The witness explained that CleanChoice Energy informed her that she would be "buying wind and solar energy." *Id.* That consumer's bills increased after the switch and, at some point, converted to a variable rate contract. *Id.* It was only later, after spending over $10,000,

that this consumer discovered that her home was not actually being supplied with the renewable energy she had been promised.  *Id*.

Senator Augustine, the sponsor of SB1, explained that "the over-lying principle in all of this is, you are not going to gouge our citizens anymore."  Sen. Augustine Testimony, March 26, 2024[4] at 12:05.  The sponsor of the House version of the bill echoed this sentiment, testifying that "[t]his bill is about consumer protection, plain and simple."  Del. Crosby Testimony, Feb 15, 2024 at 1:53:00.[5]

### III.    MARYLAND ENACTED SB1 TO PROTECT RETAIL CUSTOMERS AND CREATE A SEPARATE MARKET FOR GREEN POWER

Within that larger context, on May 9, 2024, Governor Wes Moore signed SB1 into law.  Exhibit 1.  SB1 went into effect on July 1, 2024, however the provisions at issue in this dispute apply prospectively beginning on January 1, 2025.  Exhibit 1 §§ 9-10.

SB1 creates a new two-tiered marketplace for retail electricity supply: one for electric energy comparable to Standard Offer Service (*i.e.*, "Regular Power") and another for "Green Power".  Pub. Util. §§ 7-510, 7-707.

SB1 imposes separate price caps for both Regular Power and Green Power.  *Id.* §§ 7-510(d)(2), 7-707(d).  Where suppliers could previously charge customers whatever price their contracts permitted, retail electricity suppliers of Regular Power are now prohibited

---

[4]https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=ecm&ys=2024RS&clip=ECM_3_26_2024_meeting_1&billNumber=sb0001 (last visited Oct. 29, 2029).

[5]https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=ecm&ys=2024RS&clip=ECM_2_15_2024_meeting_1&billNumber=hb0267 (last visited Oct. 29, 2024).

from charging more than the twelve-month trailing average cost of utility SOS for the customer's service area.  Pub. Util. § 7-510(d)(2).  Suppliers of eligible Green Power may exceed the price cap applicable to Regular Power subject to certain procedures for setting that price before the Commission.  Pub. Util. §§ 7-510(d)(2)(iv), 7-707(d).

SB1 also prescribes which products may be marketed as Green Power and, thus, eligible for sale at higher prices.  This ensures that Maryland consumers who choose to pay for electricity at higher than Standard Offer Service rates are actually purchasing renewable energy.  SB1 provides:

> An electricity supplier that supplies electricity to residential retail electric customers may not market electricity as green power unless:
>
> (1)    The percentage of the electricity being offered, or the equivalent number of renewable energy credits associated with the electricity being marketed as green power, that is eligible for inclusion in meeting the renewable energy portfolio standard equals or exceeds the greater of:
>
> (i) 51%; or
>
> (ii) 1% higher than the renewable energy portfolio standard for the year the electricity is provided to the customer.

Pub. Util. § 7-707(c).

Electricity that does not meet this standard cannot be marketed as Green Power, meaning it cannot be marketed with the generic terms "clean, green, eco-friendly, environmentally friendly or responsible, carbon-free, renewable, 100% renewable, 100% wind, 100% hydro, 100% solar, 100% emission-free, or similar claims."  Pub. Util. § 7-

707(a), (c).[6]  Likewise, electricity that does not meet this standard is not eligible for sale to residential consumers at the higher rates allowed for Green Power.  *Id*.

SB1 also requires that suppliers of Green Power make certain factual disclosures designed to ensure that customers understand the product they are purchasing.  For example, suppliers of "Green Power" must provide consumers with the following disclosure, "or a similar disclosure approved by the Commission[:]"

> We deliver energy through the purchase of Renewable Energy Credits (RECs).  A REC represents the social good that accompanies 1 megawatt-hour of renewable electricity generation.  RECs may be sold separately from renewable electricity itself.  Renewable electricity and RECs may be sold to different entities. The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.

Pub. Util. § 7-707(f).[7]

SB1 also requires the Commission to adopt regulations that require suppliers of Green Power to include in their marketing materials a disclosure that explains:

(1)   What the customer will actually be paying for when the customer purchases green power from the electricity supplier;

(2)   How the electricity that the customer has purchased is generated;

(3)   How the green power will benefit the environment;

(4)   The percentage of electricity that would be provided by the electricity supplier that is eligible for inclusion in meeting the renewable energy portfolio standard;

---

[6] Electricity that does not meet the Green Power standard of Section 7-707(c) must nevertheless meet the RPS renewable energy standards of Section 7-703(b).

[7] To the extent they object to any of the verbiage in the disclosure prescribed by the statute, plaintiffs may suggest alternative language.  To Defendants' knowledge, they have not done so.

(5)     The state in which the electricity was generated.

Pub. Util. § 7-707(g).  The Commission has not yet promulgated any such regulations.

Because they are not similarly situated to suppliers of electricity to residential consumers, the Green Power rules at issue in this case do not apply to: (1) energy sales by the Maryland Department of General Services ("DGS") under § 7-704.4; (2) a community choice aggregator under § 7-510.3; and (3) suppliers of electricity to commercial customers.  Pub. Util. § 7-510(b).  DGS is authorized to procure offshore wind energy and associated RECs to meet the energy needs of Maryland state government and may sell any excess energy or RECs on the PJM wholesale markets, but is not authorized to sell directly to residential consumers.  *Id*. § 7-704.4.

Pursuant to a pilot program created by the General Assembly, Montgomery County provides aggregated electricity supply to residential and small commercial customers within that county as a substitute for utility SOS and retail electricity supply.  Pub. Util. § 7-510.3.  Montgomery County's role as an energy aggregator is to purchase electricity supply on behalf of its residents; it is not itself a retail supplier.  *Id*. § 7-510.3(g).  The County's speech to its residents about this aggregation plan is, however, subject to approval by the Commission under different rules from those applicable to retail Green Power, befitting the different market role played by the county as compared to a retail supplier.

10

*See id*. § 7-510.3(d)-(f); MD. CODE REGS. 20.63.03.01 - 20.63.03.04; 20.63.07.07 - 20.63.07.14.[8]

## ARGUMENT

Plaintiffs argue that the First Amendment protects their ability to market their electricity as Green Power despite not meeting the Green Power standards of SB1. ECF 2-1 at 11-13. Second, plaintiffs argue that SB1's affirmative disclosure requirements are unconstitutional. ECF 2-1 at 13-14. Plaintiffs also argue that SB1's green energy marketing reforms cannot be severed from the other provisions of SB1, including the two-tiered marketplace. ECF 2-1 at 26-30. Plaintiffs thus seek to leverage these limited commercial speech restrictions to nullify all the consumer protections contained in SB1.

## I.    THE STRICT LEGAL STANDARD FOR A PRELIMINARY INJUNCTION.

A preliminary injunction is "'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Harrell v. University of Md. Sch. of Pharmacy*, No. MJM-24-104, 2024 WL 2155023, at *5 (D. Md. May 13, 2024) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit [and] ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Moore v. Bishop*, No. JKB-17-1919, 2018 WL

---

[8] Because the parties exempted from the Green Parties are not similarly situated to sellers of electricity to residential consumers, SBI does not, as plaintiffs suggest, favor some speakers over plaintiffs. ECF 2-1 at 16.

11

2165299, at *5 (D. Md. May 10, 2018), *aff'd*, No. 18-6663, 2019 WL 93269 (4th Cir. Jan. 3, 2019) (citation omitted).

In order to obtain such relief, a plaintiff must (1) establish that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20, 22. Thus, a moving party "must make a 'clear showing' of [the] four requirements" to obtain preliminary injunctive relief. *Harrell*, 2024 WL 2155023, at *5 (quoting *Low Tide Brewing, LLC v. Tideland Mgmt. LLC*, No. 2:21-CV-0775-DCN, 2021 WL 1381123, at *2 (D.S.C. Apr. 12, 2021)) (brackets in *Low Tide*).

To prevail on its facial challenge, Plaintiff must show that SB1 is unconstitutional in all of its application. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). The Fourth Circuit has observed that "[a] facial challenge to a statute's constitutionality presents a high bar, and 'courts must typically take care not to . . . speculate about hypothetical or imaginary cases." *Chamber of Com. v. Lierman*, 90 F.4th 679, 688–89 (4th Cir. 2024) (internal citations and quotations omitted). Plaintiffs present a facial challenge to SB1 because they allege that it is invalid as written. *See* ECF 2-1 at 1; *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). Thus, plaintiffs must demonstrate that no set of circumstances exist under which SB1 would be valid. *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citation omitted).

II.     **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS TO INVALIDATE SB 1.**

A. **The Act's Restrictions on Commercial Speech Do Not Violate the First Amendment.**

The Fourth Circuit recently explained that for "almost two centuries commercial speech, *i.e.* expression related solely to the economic interests of the speaker and its audience, was understood to fall outside of the First Amendment's ambit." *Recht v. Morrisey*, 32 F.4th 398, 407 (4th Cir. 2022) (internal citations and quotations omitted). However, in the 1970s and 1980s, the Supreme Court "set out the governing framework for analyzing commercial speech restrictions" with its decision in *Central Hudson* currently controlling. *Id.* at 407 (referring to *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)). "In doing so, *Central Hudson* recognized that the First Amendment 'accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.'" *Id.* (quoting *Central Hudson*, 447 U.S. at 563). As the Fourth Circuit noted, "[s]ubsequent cases have continued to make this distinction, noting commercial speech's 'subordinate position in the scale of First Amendment values' and the government's correspondingly 'ample scope of regulatory authority' in the commercial speech realm." *Id.* at 407-08 (quoting *Board of Trs. v. Fox*, 492 U.S. 469, 477 (1989)). In fact, "the Supreme Court has 'always been careful to distinguish commercial speech from speech at the First Amendment's core.'" *Id.* at 408 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995)).

As a result of its "subsidiary status, commercial speech can be subjected to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Id.*

13

(quoting *Fox*, 492 U.S. at 477). "For instance, 'there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity.'" *Id.* (quoting *Central Hudson*, 447 U.S. at 563). Thus, the Supreme Court has long recognized the "common-sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978). "Strict scrutiny is therefore improper when reviewing laws that regulate commercial speech." *Recht*, 32 F.4th at 408.

Courts assess three factors to identify commercial speech: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Maryland Shall Issue, Inc. v. Anne Arundel County*, 662 F. Supp. 3d 557, 574 (D. Md. 2023), *aff'd*, 91 F.4th 238 (4th Cir. 2024) (internal citations and quotations omitted). "While [t]he combination of all these characteristics . . . provides strong support for the . . . conclusion that [speech is] properly characterized as commercial speech, it is not necessary that each of the characteristics be present in order for speech to be commercial[.]" *Id.* (internal citations and quotations omitted)).

Here, the challenged provisions of SB1 are commercial speech because they include all three factors. First, the challenged provision of SB1 only regulates retail energy suppliers who seek to market Green Power to Maryland residential customers. *See* Pub. Util. § 7-707(a), (c). Second, SB1 only regulates commercial retailers and the challenged provisions only refer to retailer energy suppliers' specific product or service, namely,

14

electricity, and more specifically, electricity marketed as Green Power to Maryland consumers. *See* Pub. Util. § 7-707(a), (c). Again, plaintiffs concede as much throughout their motion, stating that SB1 would prohibit REAL's members and Green Mountain from marketing their existing energy offerings to its current and potential customers. EFC 2-1 at 12-13. Third, the regulated speakers, retail energy suppliers such as Green Mountain and REAL's members, have an economic motivation for the speech, as they market and sell electricity to Maryland residential consumers. ECF 2-1 at 11-13.

Courts in the Fourth Circuit have found various commercial practices to be commercial speech when, as here, the three factors are met. *See, e.g., Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 370 (4th Cir. 2012) (affirming dismissal of complaint and denial of a motion for preliminary injunction by store owner claiming violations of first amendment with respect to commercial speech); *Stover v. Fingerhut Direct Mktg., Inc.*, 709 F. Supp. 2d 473, 479 (S.D.W. Va. 2009) (denying defendant debt collector's motion to dismiss because the debt collection practices, as commercial speech, were only entitled to a modicum of First Amendment protection).

Even though the speech regulated by SB1 is commercial, plaintiffs largely ignore this critical point in their motion. Indeed, plaintiffs largely rely on cases not involving commercial speech. ECF 2-1 at 14-15 (citing to *Vidal v. Elster*, 602 U.S. 286, 292 (2024), *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and *National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018)). One of the few supporting cases plaintiffs cite which does analyze restrictions on commercial speech, reaffirms that the government has a "legitimate interest in protecting consumers from commercial harms[,] which

15

explains why commercial speech can be subject to greater governmental regulation than noncommercial speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011). However, as discussed below, unlike this matter, in *Sorrell*, the state did not "argue that the provision challenged here will prevent false or misleading speech." *Id.*

Plaintiffs dismiss the idea that the speech in question is commercial because it restricts "companies from expressing their views about the types of products" that are clean, green, or other similar descriptions, and are thus encompassing speech doing more than proposing a commercial transaction. ECF 2-1 at 18. Yet, this ignores that the only prohibitions in SB1 are to the marketing of these products to the public. Pub. Util. § 7-707(a), (c). Thus, beyond restricting plaintiffs' ability to market Green Power to consumers, SB1 does not restrict plaintiffs' ability to express their views on what can or should constitute "green" electricity outside of marketing communications regulated by SB1.

If the Court were to adopt plaintiffs' logic, which is not supported by any authority, any prohibition against misleading marketing could be moved outside of commercial speech simply because a commercial enterprise claims it was prevented from expressing its views on the product it is trying to market. Likewise, plaintiffs claim that their service offerings and marketing are not "merely commercial" because REAL's members "believe that their carbon-neutral products help ameliorate the impacts of climate change, among other *social benefits*." ECF 2-1 at 18. (emphasis added). Without any citation to authority, in essence, plaintiffs argue that a commercial enterprise, to avoid regulation of its otherwise

16

commercial speech, need only claim that it held a strong belief in the benefits of its product.

ECF 2-1 at 18.  Plaintiffs' argument should be rejected.

## B. SB1's Restrictions on Commercial Speech Pass the Intermediate Scrutiny Test.

### 1.  The Commercial Speech at Issue is Misleading.

Because SB1 regulates commercial speech, *Central Hudson*'s four-part intermediate-scrutiny applies.  *See Recht*, 32 F.4th at 408.  First, commercial speech comes within First Amendment protection if it concerns lawful activity and is not misleading.  *Id.* (citing *Central Hudson*, 447 U.S. at 566).  Next, courts look to "'whether the asserted governmental interest of the regulation is substantial.'"  *Id.* (quoting *Central Hudson*, 447 U.S. at 566).  "'If both inquiries yield positive answers, [a court] must determine whether the regulation directly advances the governmental interest asserted, and, whether it is not more extensive than is necessary to serve that interest.'"  *Id.* (quoting *Central Hudson*, 447 U.S. at 566).

The first part of the *Central Hudson* intermediate-scrutiny analysis here is dispositive.  "The government retains the right to regulate false, deceptive, or misleading sales techniques."  *Federal Trade Comm'n v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 362 (D. Md. 2020) (internal citation and quotation omitted).  Accordingly, Maryland may ban forms of commercial communication that are more likely to deceive the public than to inform it.  *See Syndicated Publ'n, Inc. v. Montgomery County, Md.*, 921 F. Supp. 1442, 1450-51 (D. Md. 1996) (holding that misleading advertisement was not afforded First Amendment protections).  Maryland is "not required to make an elaborate evidentiary

17

showing at trial in order to establish the misleading nature of the regulated speech." *Accountant's Soc. of Va. v. Bowman*, 860 F.2d 602, 606 (4th Cir. 1988) (affirming ban on use of the term "public accountant" or "PA" by unlicensed accountants).

In *Federal Trade Comm'n*, advertisements for a "health guidebook" claiming that dieting was not required to reverse diabetes and that its guidance was "scientifically proven to reverse your diabetes in just 28 days" constituted misrepresentations not protected by the First Amendment. *Federal Trade Comm'n v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 366 (D. Md. 2020). This Court determined that these "two misrepresentations are material in that they would induce a reasonable consumer, who does not want to abide by a medically restricted diet, to purchase the publication." *Id.* at 366–67. "People have a right to assume that fraudulent advertising traps will not be laid to ensnare them. Laws are made to protect the trusting as well as the suspicious." *Id.* at 366 (quoting *Donaldson v. Read Magazine*, 333 U.S. 178 (1948)); *Abdo v. U.S. I.R.S.*, 234 F. Supp. 2d 553, 567 (M.D.N.C. 2002), *aff'd*, 63 F. App'x 163 (4th Cir. 2003) (finding no violation of First Amendment when plaintiff provided false and fraudulent tax advice).

While the commercial speech at issue in SB1 is part of lawful activity, the targeted commercial speech is misleading. False promises of green energy or 100% renewable energy have enticed consumers to pay higher than Standard Offer Service rates. Exhibits 4-6. As the sponsor of SB1 explained, this is a consumer protection law intended to protect Maryland consumers. SB1 eliminates misleading marketing of green energy by providing a definition of Green Power based upon the state's well-established RPS. Pub. Util. § 7-707(a), (c). Now, only retail energy suppliers who meet Maryland's reasonable criteria for

selling and marketing Green Power are able to market it as such to Maryland consumers. *Id.* No longer will Maryland customers pay higher monthly rates only to find out that the "green" electricity they were promised is derived from non-renewable or out-of-state sources. Not only are the marketing techniques regulated by SB1 more likely to deceive the public than to inform it, but without the protections of SB1, the public will remain at risk of misleading marketing practices by sellers of "green" electricity.

### 2. Maryland has a Substantial Interest in Consumer Protection.

Even if this Court determines that the marketing regulated by SB1 is not misleading, and therefore protected by the First Amendment, SB1 should still survive First Amendment intermediate-scrutiny because the remaining factors weigh heavily in favor of upholding SB1. The state has a substantial governmental interest in protecting its citizens from misleading commercial speech through its consumer protection police powers. In this regard, the Supreme Court has observed that states possess a "particularly strong" interest in adopting and enforcing rules of conduct designed to protect the public from harmful solicitation, "[i]n addition to a state's general interest in protecting consumers and regulating commercial transactions." *Ohralik v. Ohio State Bar Assn.*, 436 US 447, 460 (1978); *see also Florida Bar*, 515 US at 625 ("[w]e have little trouble crediting the Bar's interest as substantial."). This Court stated that "[t]he Supreme Court has long recognized the state's general interest in protecting consumers and regulating commercial transactions." *Syndicated Publications, Inc.*, 921 F. Supp. at 1451 (citing *Ohralik*, 436 US at 458).

Significantly, the field of third-party energy supply market is one in which Maryland has regulated for years. The entire third-party energy supplier market would not even exist but for the state's deregulation of the industry in 1999. Exhibit 2, at 10. In turn, Maryland has empowered the Commission to regulate the market and to ensure consumer protections exist. *See* Pub. Util. § 7-507(k).

### 3. SB1 Directly Advances Maryland's Interest in Strong Consumer Protections.

In order to demonstrate that the statute at issue directly advances Maryland's substantial interest in consumer protection, the state must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Walraven v. NC Bd. of Chiropractic Examiners*, 273 F. App'x 220, 224 (4th Cir. 2008) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)). "The Supreme Court has permitted governmental bodies to justify speech regulations by reference to studies and/or anecdotal evidence." *Id.* Here, the testimony in support of SB1 amply highlights the significant concerns addressed by SB1, including misleading advertising. Exhibits 3-6. Indeed, the sponsor of the bill testified that the overarching principle of SB1 is that "you are not going to gouge our citizens anymore." SB1's definition of Green Power ensures that Maryland consumers who choose to pay more for "green" electricity will know that the energy they receive is in fact green.

### 4. SB1's Restrictions are not More Extensive than is Necessary.

This analysis "complements the direct-advancement inquiry." *Recht*, 32 F.4th at 414 (quoting *Greater New Orleans Broad. Ass'n, v. U.S.*, 527 U.S. at 173, 188 (1999)).

20

Here, Maryland "is not required to employ the least restrictive means conceivable[, but i]nstead, there needs to be a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs . . . a means narrowly tailored to achieve the desired objective." *Id.* (internal quotations and citations omitted). Because "it is difficult to 'establish[] with precision the point at which restrictions become more extensive than their objective requires,' this standard gives the State 'needed leeway in a field (commercial speech) traditionally subject to governmental regulation.'" *Id.* (quoting *Fox*, 492 U.S. at 477).

In *Recht*, the Fourth Circuit upheld a West Virginia law regulating lawyers' advertisements targeting clients in litigation involving medications or medical devices. *Id.* at 416. In so ruling, the court explained that the state's prohibition of advertisements styled as consumer medical alerts "plainly pass this test[,]" and noted that "each prohibition targets particular misleading words or images in order to protect public health and prevent citizens from taking misguided medical actions based on attorney advice." *Id.* at 414. Further, the West Virginia act in question did "not strip attorneys of the ability to advertise." *Id.*

Here, SB1 would similarly pass this test. As in *Recht*, electricity suppliers are not prohibited from advertising but, in order to market electricity as "green," must supply electricity which meets Maryland's definition of Green Power. This regulation will protect consumers from being induced into paying higher rates for electricity on the mistaken

belief they are getting only renewable energy sourced locally and, as a result, helping to combat climate change.

Plaintiffs argue that Maryland could find less restrictive means in order to address the problem of consumer deception. ECF 2-1 at 21-22. However, none of these proposed solutions would actually solve the problems that SB1 is intended to address. Plaintiffs suggest that current regulations which require disclosures are sufficient, *see* ECF 2-1 at 21, however, given the testimony in support of SB1, the Commission requires additional legislation to eliminate misleading marketing. *See* Exhibits 4-6. Importantly, under the applicable intermediate standard of review, the state is not required to employ the least restrictive means to accomplish its consumer protection goals. Regardless, while plaintiffs suggest that Maryland simply "tweak" current regulations to ensure accurate marketing, they provide no explanation as to how this would eliminate the exact situation where consumers are paying higher monthly rates only to discover they are not in fact receiving "green" electricity as promised.

Plaintiffs also suggest that Maryland could embark on an education campaign for consumers on the benefits of "products contain[ing] the REC mix Maryland believes is 'green.'" ECF 2-1 at 22. In rejecting a similar suggestion, in *Recht*, the Fourth Circuit observed that a public awareness campaign would not be more effective than the West Viginia law's prohibition and that misleading speech would "wipe out the potential benefits of such a campaign." *Recht*, 32 F.4th at 415. Here, the benefits of any public awareness campaign would be wiped out by contrary messages from retail electricity suppliers.

22

In sum, SB1's reasonable restrictions on misleading commercial speech and factual disclosures ensure that Maryland consumers of electricity will no longer be misled.

## C. The Act's Disclosure Requirements Do Not Violate the First Amendment.

"The Supreme Court has made clear that there are 'material differences between disclosure requirements and outright prohibitions on speech.'" *Recht*, 32 F.4th at 416 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)). "After all, as the Court noted, the 'constitutionally protected interest in not providing any particular factual information in . . . advertising is minimal.'" *Id.* (quoting *Zauderer*, 471 U.S. at 651). Given this, "while prohibitions on commercial speech must pass the test articulated in *Central Hudson*, *Zauderer* held that laws requiring advertisers to disclose 'purely factual and uncontroversial information' are permissible as long as the disclosure requirements are 'reasonably related to the State's interest in preventing deception of consumers.'" *Id.* (quoting *Zauderer*, 471 U.S. at 651).

In *American Meat Institute v. U.S. Dep't of Agric.*, a trade group sought to preliminarily enjoin the Department of Agriculture's disclosure requirement for 'country-of-origin labeling" of meat as a violation of the First Amendment. *American Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 51 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir.), *reh'g en banc granted, opinion vacated*, 2014 WL 2619836 (D.C. Cir.), *and judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014). In that case, now Justice Brown Jackson determined that the *Zauderer* test could be applied "even where [the government] had not made an affirmative showing that the public had previously been deceived and thus the

23

compelled disclosure was necessary, as long as the ***possibility*** of deception . . . was self-evident." *Id.* at 49. (internal citations and quotations omitted) (emphasis in original). Finding that a required country-of-origin disclosure was factual and noncontroversial, the court held that disclosure survived the "unquestionably lenient" reasonably related standard and denied a trade group's preliminary injunction motion. *Id.* at 52.

SB1 passes the *Zauderer* test[9] because it merely requires disclosure of purely factual information by explaining that a REC is an intangible asset of one MWh renewable energy generation, which can be sold separately from electricity. Pub. Util. § 7-707(f). Presumably because most lay persons are unfamiliar with RECs, Green Mountain's website provides the very same factual information:

> Renewable energy certificates (aka renewable energy credits, or RECs) represent the environmental and other non-power attributes of renewable electricity generation and are part of most renewable electricity products. RECs are measured in ***1 megawatt-hour (MWh)*** increments of power generated from renewable sources like wind, solar, hydro and biomass, and ***can be traded separately from the actual electricity*** produced by renewable facilities.

https://www.greenmountainenergy.com/en/why-renewable-energy/benefits-of-clean-electricity (last visited Oct. 29, 2024). REAL also provides the same factual information on its website. *See* https://www.retailenergychoice.org/answering-the-customer-call-for-clean-energy/ (last visited Oct. 29, 2024). The disclosures required by Section 7-707(f) are essentially the same these publicly made statements by Plaintiffs. Pub. Util. §§ 7-707(f).

---

[9] Even if this Court were to determine that *Central Hudson* is controlling, the disclosure requirements would survive this challenge because they advance the substantial government interest of consumer protection and are not more extensive than necessary.

This Court recently upheld as factual a disclosure regarding suicide prevention that Anne Arundel County required gun stores to provide. Determining that the only assessment necessary was whether access to firearms is a risk factor for an increased risk of suicide, the Court held that "the statement that access to firearms is a risk factor for suicide is factual." *Maryland Shall Issue, Inc.*, 662 F. Supp. 3d at 579-80. This Court also found that the definition of conflict resolution was a "straightforward definition . . . present[ing] purely factual information." *Id.* at 580. Here this Court should hold the same, as there is no dispute that RECs are represent one MWh of renewable energy.

Whether a disclosure is controversial requires more than a "dispute about simple factual accuracy." *Id.* In *Maryland Shall Issue*, this Court concluded that, despite being connected to the controversial topic of firearm regulation, basic factual information about safe gun storage, warning signs of suicide, and conflict regulation were not controversial. *Id.* Likewise, although climate change and environmental policy may be controversial, the notion of consumer protection is not. Here, the only dispute appears to be over the factual accuracy of the terms "REC" and "social good." This is insufficient to deem the disclosure controversial.

Although conceding that RECs "further various social goods," Plaintiffs attempt to split hairs by complaining that the disclosure required by Section 7-707(f) compels them to specifically state that RECs are a "social good." ECF 2-1 at 13-14. Plaintiffs do not argue that that disclosure is controversial. *Id.* Nevertheless, because SB1 permits suppliers to propose an alternative disclosure, subject to Commission approval, plaintiffs may seek

to craft a disclosure more to their liking.  Pub. Util. § 7-707(f).  Instead, plaintiffs seek to invalidate a nearly 50-page law because of suggested use of the term "social good[.]"

The disclosure required by Section 7-707(f) is reasonably related to Maryland's interest in preventing deception of consumers.  As noted, the disclosure simply informs consumers what a REC actually is, thereby allowing them to make educated purchasing decisions in connection with a complex subject matter.  Pub. Util. § 7-707(f).

## D. Defendants are Immune from Suit in Federal Court for Plaintiffs' Maryland Claims.

Upon the formation of the United States, the States retained their status as sovereign entities and thereby retained their immunity from suit.  *Alden v. Maine*, 527 U.S. 706, 713 (1999).  Under the Eleventh Amendment, a state's immunity from suit limits federal court jurisdiction.  *Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64 (2001).  Although plaintiffs may seek prospective injunctive relief against a state official acting in their official capacity, *Just Puppies, Inc. v. Frosh*, 438 F. Supp. 3d 448, 483 (D. Md. 2020), *vacated and remanded on other grounds, Just Puppies, Inc. v. Frosh*, 2021 WL 4452349 (4th Cir. Apr. 29, 2021), they may only do so to prevent an ongoing violation of federal law, not with respect to alleged violations of state law.  *See Bragg v. West Va. Coal Ass'n*, 248 F.3d 275, 296-97 (4th Cir. 2001); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (concluding that *Ex parte Young,* 209 U.S. 123 (1908) is "inapplicable in a suit against state officials on the basis of state law").

Because they are based on alleged violations of Maryland law, this Court does not have jurisdiction to hear plaintiffs' claims for violation of the Maryland Declaration of

26

Rights' Article 40. *See Verizon Md. Inc. v. RCN Telecom Servs., Inc.*, 232 F. Supp. 2d 539, 546 (D. Md. 20002) (quoting *Pennhurst State Sch. & Hosp.*, 465 U.S. at 98 ("Because 'the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art[icle] III,' it would seem to limit the extent of a federal court's subject-matter jurisdiction.")) Therefore, plaintiffs improperly bring before the Court these counts (Count II and Count IV), which have no likelihood of success.

## II.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM FROM ENFORCEMENT OF SB1.

Not only do plaintiffs fail to show that they are likely to succeed on the merits of their claim, but plaintiffs also fail to demonstrate that they can satisfy the remaining preliminary injunction factors. In their motion, plaintiffs argue that they will suffer irreparable harm because all First Amendment infringements are *per se* irreparable and that they will lose customers due to the enactment of SB1. ECF 2-1 at 23-24. Once fully analyzed, however, neither of these arguments are convincing.

"[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim." *West Virginia Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (internal quotation and citation omitted) (vacating district court's order for preliminary injunction when plaintiff was unable to demonstrate likelihood of success on the merits of its First Amendment challenge). "Determination of irreparable harm thus requires analysis of [plaintiff's] likelihood of success on the merits[.]" *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507,

27

511 (4th Cir. 2002). As discussed above, because plaintiffs are not likely to succeed on the merits of their claim, they have failed to show *per se* irreparable harm from their alleged First Amendment violations. Furthermore, the mere possibility of irreparable harm is insufficient to permit issuance of a preliminary injunction. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

### III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST GRANTING THE PRELIMINARY INJUNCTION.

"When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) and *Roe v. Department of Def.*, 947 F.3d 207, 230 (4th Cir. 2020)). Plaintiffs argue that due to "the deprivation of their First Amendment rights, the balance of the equities weighs in their favor." ECF 2-1 at 25. Similarly, plaintiffs claim that upholding constitutional rights are in the public interest, again weighing in their favor. *Id.* However, as shown above, plaintiffs are unlikely to succeed on the merits of their First Amendment and Article 40 claims and, as a result, neither of these arguments are compelling.

Meanwhile, because of energy suppliers' behavior, Maryland homeowners have suffered and, without SB1, will continue to suffer harms, including substantial financial harm, from misleading advertisements and business practices. In the years before passage of SB1, Maryland homeowners who were customers of third-party energy suppliers, paid millions of additional dollars a year in higher payments compared to staying with their utility. Exhibits 3-6. Despite paying these premiums, too often Maryland consumers felt

28

that they did not receive the green energy they were promised.  Exhibits 4-6.  It is well established that there is a strong public interest in enforcement of consumer protections designed to prevent misleading marketing.  *See Fed. Trade Comm'n*, 447 F. Supp. 3d at 359 (internal quotations and citations omitted) (analyzing federal consumer protection laws).  "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).  Courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982), and there is danger to the public in precluding Maryland from being able to enforce SB1.  *See Person v. Mayor & City Council of Balt.*, 437 F. Supp. 2d 476, 479 (D. Md. 2006) (stating that there is a substantial danger of a mistake in granting a preliminary injunction because the decision is made on an incomplete record).  These factors, like all the others, favors the State.  Thus, the Court should deny the motion for preliminary injunction.

## IV.   EVEN IF PLAINTIFFS' MOTION IS GRANTED, SB1 SHOULD NOT BE ENJOINED IN ITS ENTIRETY.

Even if this Court finds that plaintiffs are likely to succeed on the merits of their First Amendment claims and are otherwise entitled injunctive relief, this Court should not enjoin those portions of the law that do not restrict the use of the term "Green Power" or mandate disclosures.  Whether severance of a state enactment is appropriate is a question of state law.  *See Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 627 (4th Cir. 2002).  In Maryland, the legislative intent

determines whether an offending provision may be severed. *See Park v. Board of Liquor License Comm'rs for Baltimore City*, 338 Md. 366, 382 (Md. 1995). Indeed, under Maryland law, "[e]xcept as otherwise provided, the provisions of all statutes enacted after July 1, 1973, are severable." Md. Code Ann., Gen. Prov. § 1-210(a). "The finding by a court that part of a statute is unconstitutional or void does not affect the validity of the remaining portions of the statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent." *Id.* § 1-210(b). Further, "[u]nder Maryland law, there is a strong presumption that if a portion of an enactment is found to be invalid, the intent of the legislative body is that such portion be severed." *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 596 (2001) (quotation marks and brackets omitted).

As discussed above, SB1 is a wide-ranging consumer protection reform law intended to address various unscrupulous marketing and business tactics used in the retail energy supplier marketplace. SB1 is sets forth an number of provisions which independently stand on their own, including the prohibition on variable rate contracts, Pub. Util. § 7-510(d)(2)(v); the prohibition on commission-based compensation, Pub. Util. § 7-510(d)(2)(v); and license requirements of energy salespersons and energy vendors, Pub. Util. §§ 7-317, 7-318; all of which should remain valid even if this Court determines to strike down the Green Power marketing and disclosure requirements.

### CONCLUSION

The Court should deny the motion for preliminary injunction.

Respectfully submitted,

/s/ *Colin Glynn*

COLIN GLYNN
Federal Bar No. 19049
Associate General Counsel
Maryland Public Service Commission
6 Saint Paul Street
16th Floor
Baltimore, Maryland 21202
colin.glynn@maryland.gov
(410) 576-8039

Attorney for Defendants, Frederick H. Hoover, Michael T. Richard, Kumar P. Barve, and Bonnie E. Suchman

ANTHONY G. BROWN
Attorney General of Maryland

/s/ *James D. Handley*

JAMES D. HANDLEY
Federal Bar No. 20299
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
20th Floor
Baltimore, Maryland 21202
jhandley@oag.state.md.us
(410) 576-7058
(410) 576-6995 (facsimile)

October 29, 2024

Attorneys for Defendant, Anthony G. Brown

31

## CERTIFICATE OF SERVICE

I certify that, on this 29th day of October, 2024 the foregoing was served by CM/ECF on all counsel of record.

/s/ *James D. Handley*
JAMES D. HANDLEY

32